RICHARD B. KATSKEE*
AMERICANS UNITED FOR SEPARATION
OF CHURCH AND STATE
1310 L Street NW, Suite 200
Washington, DC 20005
Tel: (202) 466-3234; Fax: (202) 466-3353
katskee@au.org

GENEVIEVE SCOTT*
CENTER FOR REPRODUCTIVE RIGHTS
199 Water Street, 22nd Floor
New York, NY 10038
Tel: (917) 637-3605; Fax: (917) 637-3666
gscott@reprorights.org

JAMIE A. GLIKSBERG*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
105 West Adams, 26th Floor
Chicago, IL 60603-6208
Tel: (312) 663-4413; Fax: (312) 663-4307
jgliksberg@lambdalegal.org

JAMES R. WILLIAMS (SBN 271253)
GRETA S. HANSEN (SBN 251471)
LAURA S. TRICE (SBN 284837)
MARY E. HANNA-WEIR (SBN 320011)
SUSAN P. GREENBERG (SBN 318055)
H. LUKE EDWARDS (SBN 313756)
OFFICE OF THE COUNTY COUNSEL,
COUNTY OF SANTA CLARA
70 West Hedding Street, East Wing, 9th Fl.
San José, CA 95110-1770
Tel: (408) 299-5900; Fax: (408) 292-7240
mary.hanna-weir@cco.sccgov.org

LEE H. RUBIN (SBN 141331)
MAYER BROWN LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
Tel: (650) 331-2000; Fax: (650) 331-2060
lrubin@mayerbrown.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| COUNTY OF SANTA CLARA, TRUST WOMEN SEATTLE, LOS ANGELES LGBT CENTER, WHITMAN-WALKER CLINIC, INC. d/b/a WHITMAN-WALKER HEALTH, BRADBURY-SULLIVAN LGBT COMMUNITY CENTER, CENTER ON HALSTED, HARTFORD GYN CENTER, MAZZONI CENTER, MEDICAL STUDENTS FOR CHOICE, AGLP: THE ASSOCIATION OF LGBTQ+ PSYCHIATRISTS, AMERICAN ASSOCIATION OF PHYSICIANS FOR HUMAN RIGHTS d/b/a GLMA: HEALTH PROFESSIONALS ADVANCING LGBTQ EQUALITY, COLLEEN MCNICHOLAS, ROBERT BOLAN, WARD CARPENTER, SARAH HENN, and RANDY PUMPHREY, <br><br> Plaintiffs, <br><br> vs. <br><br> U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES and ALEX M. AZAR, II, in his official capacity as SECRETARY OF HEALTH AND HUMAN SERVICES, <br><br> Defendants. | Case No. 5:19-cv-2916 <br><br> **PLAINTIFFS' MOTION FOR NATIONWIDE PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> Hearing Date: July 17, 2019 <br> Hearing Time: 1:00 p.m. <br><br> Trial Date: None Set |

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 1

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 3

    A.    Congress's Consideration Of Religious Objections And The Needs Of Patients .................................................................................................................. 3

    B.    The Administration's Decision To Disrupt The Existing Scheme By Promulgating The Denial-of-Care Rule ............................................................... 5

    C.    What The Denial-Of-Care Rule Does ....................................................................... 6

    D.    How The Denial-Of-Care Rule Will Harm Doctors, Patients, and Healthcare Providers ................................................................................................ 9

ARGUMENT ....................................................................................................................... 12

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................................. 13

    A.    Plaintiffs Are Likely To Succeed In Demonstrating that The Rule Violates the APA .......................................................................................................... 13

        1.    The Rule is Arbitrary and Capricious ....................................................... 13

            a.    Harm to Patients ............................................................................ 14

            b.    Providers' Need to Reconcile Religious Objections With Providing Healthcare ................................................................. 16

        2.    The Rule Conflicts With Existing Healthcare Laws ................................. 18

            a.    ACA—Access to Care and Information ...................................... 18

            b.    EMTALA ...................................................................................... 18

            c.    ACA—Nondiscrimination ........................................................... 19

        3.    The Rule Goes Beyond HHS's Statutory Authority ................................ 20

            a.    Assist in the Performance ............................................................ 20

            b.    Discriminate or Discrimination ................................................... 22

    B.    Plaintiffs Are Likely to Succeed On Their Establishment Clause Claim ............ 23

        1.    The Rule impermissibly imposes the costs and burdens of objecting employees' religious beliefs on patients and other third parties .............. 23

        2.    The Rule impermissibly coerces patients and healthcare providers to adhere to the government's favored religious practices ....................... 25

    C.    Plaintiffs Are Likely to Succeed on Their Equal Protection Claim ..................... 26

    D.    Plaintiffs Are Likely to Succeed On Their Due Process Claim ........................... 28

        1.    Abortion ................................................................................................... 29

2.      Contraception ........................................................... 30

3.      Gender-Affirming Care ........................................... 31

E.     Plaintiffs Are Likely to Succeed On Their Free Speech Claim ............................ 33

F.     The County Is Likely to Succeed on Its Separation-of-Powers and Spending Clause Claims ...................................................................... 35

II.    IF PERMITTED TO TAKE EFFECT, THE RULE WILL IRREPARABLY HARM PLAINTIFFS, THEIR MEMBERS, AND THEIR PATIENTS ......................... 37

A.     The Rule Will Severely Harm Plaintiffs' Patients ................................................. 37

B.     The Rule Will Require Plaintiff Healthcare Providers to Incur Substantial, Unrecoverable Costs ...................................................................... 38

C.     The Rule Will Compromise Plaintiffs' Operations, Missions, And Core Functions ...................................................................... 39

III.   THE BALANCE OF THE EQUITIES FAVORS PLAINTIFFS, AND AN INJUNCTION IS IN THE PUBLIC INTEREST ............................................................... 42

IV.   THE COURT SHOULD ENTER A NATIONWIDE INJUNCTION .............................. 43

CONCLUSION ...................................................................... 44

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Arroyo Gonzalez v. Rossello Nevares,*
    305 F. Supp. 3d 327 (D.P.R. 2018)..................................................................32

*Bowen v. Georgetown Univ. Hosp.,*
    488 U.S. 204 (1988)..................................................................................20

*Boyden v. Conlin,*
    341 F. Supp. 3d 979 (W.D. Wis. 2018) ..........................................................20

*Bresgal v. Brock,*
    843 F.2d 1163 (9th Cir. 1987)......................................................................43

*Burwell v. Hobby Lobby Stores, Inc.,*
    134 S. Ct. 2751 (2014) ...............................................................................23

*Califano v. Yamasaki,*
    442 U.S. 682 (1979)..................................................................................43

*California v. Azar,*
    2019 WL 1877392 (N.D. Cal. Apr. 26, 2019) .................................................38, 40

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018)................................................................ *passim*

*Carey v. Population Servs. Int'l,* 431 U.S. 678 (1977) ...........................................30, 31

*Chevron U.S.A. Inc. v. Natural Resources Defense Council,*
    467 U.S. 837 (1984)..................................................................................14

*City & Cnty. of S.F. v. Trump,*
    897 F.3d 1225 (9th Cir. 2018).....................................................................35, 40

*City of Arlington, Tex. v. F.C.C.,*
    569 U.S. 290 (2013)..................................................................................35

*City of Cleburne, Tex. v. Cleburne Living Ctr.,*
    473 U.S. 432 (1985)..................................................................................27

*Clinton v. City of New York,*
    524 U.S. 417 (1998)..................................................................................35

*Cmty. House, Inc. v. City of Boise,*
    490 F.3d 1041 (9th Cir. 2007).....................................................................23

*Conant v. Walters*,
   309 F.3d 629 .................................................................................................................35

*Coons v. Lew*,
   762 F.3d 891 (9th Cir. 2014).........................................................................................32

*Cnty. of Santa Clara v. Trump*,
   250 F. Supp. 3d 497 (N.D. Cal. 2017) ....................................................................39, 41

*Cutter v. Wilkerson*,
   544 U.S. 709 (2005) .......................................................................................................24

*Doe v. Harris*,
   772 F.3d 563 (9th Cir. 2014)..........................................................................................33

*Doe ex rel. Doe v. Yunits*,
   2000 WL 33162199 (Mass. Super. Oct. 11, 2000), *aff'd sub nom, Doe v.
   Brockton Sch. Comm.*, 2000 WL 33342399 (Mass. App. Ct. Nov. 30, 2000) .........................33

*E. Bay Sanctuary Covenant v. Trump*,
   354 F. Supp. 3d 1094 (N.D. Cal. 2018) ........................................................................44

*E. Bay Sanctuary Covenant v. Trump*,
   909 F.3d 1219 (9th Cir. 2018).......................................................................................43

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
   135 S. Ct. 2028 (2015) ...................................................................................................22

*Eisenstadt v. Baird*, 405 U.S. 438 (1972) ...................................................................................30

*Elrod v. Burns*,
   427 U.S. 347 (1976).......................................................................................................38

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016)..............................................................................................14, 17

*Evancho v. Pine-Richland Sch. Dist.*,
   237 F. Supp. 3d 267 (W.D. Pa. 2017) ...........................................................................27

*F.V. v. Barron*,
    286 F. Supp. 3d 1131 (D. Idaho 2018)...........................................................................27

*Fabian v. Hosp. of Cent. Conn.*,
   172 F. Supp. 3d 509 (D. Conn. 2016) ............................................................................26

*Fricke v. Lynch*,
   491 F. Supp. 381 (D.R.I. 1980)......................................................................................33

*Gay Students Org. of Univ. of N.H. v. Bonner*,
   509 F.2d 652 (1st Cir. 1974) ..........................................................................................33

*Golinski v. U.S. Office of Pers. Mgmt.*,
   824 F. Supp. 2d 968 (N.D. Cal. 2012) ...................................................................27

*Gonzales v. Carhart*,
   550 U.S. 124 (2007) ...........................................................................................29

*Griswold v. Connecticut*,
   381 U.S. 479 (1965). .........................................................................................30

*Harris v. Bd. of Supervisors, Los Angeles Cnty.*,
   366 F.3d 754 (9th Cir. 2004)...............................................................................37

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ...........................................................................................42

*Henkle v. Gregory*,
   150 F. Supp. 2d 1067 (D. Nev. 2001) ................................................................33

*Hernandez-Montiel v. INS*,
   225 F.3d 1084 (9th Cir. 2000), *overruled on other grounds by Thomas v.
   Gonzales*, 409 F.3d 1177 (9th Cir. 2005).............................................................32

*Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*,
   471 U.S. 707 (1985)...........................................................................................36

*Inouye v. Kemna*,
   504 F.3d 705 (9th Cir. 2007)...............................................................................26

*Karnoski v. Trump*,
   2018 WL 1784464 (W.D. Wash. Apr. 13, 2018)...................................27, 32, 33

*Larson v. Valente*,
   456 U.S. 228 (1982) ...........................................................................................23

*Lawrence v. Texas*,
   539 U.S. 558 (2003) .............................................................................29, 30, 31, 32

*Lee v. Weisman*,
   505 U.S. 577 (1992) ...........................................................................................25

*Log Cabin Republicans v. United States*,
   716 F. Supp. 2d 884 (C.D. Cal. 2010), *vacated as moot*, 658 F.3d 1162 (9th
   Cir. 2011) ...........................................................................................................33

*Los Angeles Haven Hospice, Inc. v. Sebelius*,
   638 F.3d 644 (9th Cir. 2011)...............................................................................20

*McCreary Cnty. v. ACLU of Ky.*,
   545 U.S. 844 (2005) ....................................................................................23, 28

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996) ............................................................................................ 36

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ......................................................................... 38, 43

*Mendocino Envtl. Ctr. v. Mendocino Cnty.*,
  192 F.3d 1283 (9th Cir. 1999) ............................................................................ 33

*Mississippi Univ. for Women v. Hogan*,
  458 U.S. 718 (1982) ............................................................................................ 31

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .............................................................................................. 13

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) ....................................................................................... 36, 39

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
  145 F.3d 1399 (D.C. Cir. 1998) .......................................................................... 44

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................................ 42

*Norsworthy v. Beard*,
  87 F. Supp. 3d 1104 (N.D. Cal. 2015) ........................................................... 26, 27

*Norwood v. Harrison*,
  413 U.S. 455 (1973) ............................................................................................ 33

*Obergefell v. Hodges*,
  135 S. Ct. 2584 (2015) ............................................................................. 28, 30, 32

*Palmore v. Sidoti*,
  466 U.S. 429 (1984) ............................................................................................ 28

*Pennhurst State School and Hosp. v. Halderman*,
  451 U.S. 1 (1981) ................................................................................................ 36

*Pennsylvania v. Trump*,
  351 F. Supp. 3d 791 (E.D. Pa. 2019) .................................................................. 37

*Perry v. Sindermann*,
  408 U.S. 593 (1972) ............................................................................................ 34

*Peterson v. Hewlett-Packard Co.*,
  358 F.3d 599 (9th Cir. 2004) .............................................................................. 22

*Pimentel v. Dreyfus*,
  670 F.3d 1096 (9th Cir. 2012) ............................................................................ 13

vi

*Planned Parenthood Ass'n of Cincinnati, Inc. v. Cincinnati*,
    822 F.2d 1390 (6th Cir. 1987)..................................................................................43

*Planned Parenthood v. Casey*, 505 U.S. 833 (1992) ............................................ *passim*

*Police Dep't of Chicago v. Mosley*,
    408 U.S. 92 (1972) ...................................................................................................34

*Prestcott v. Rady Children's Hospital-San Diego*,
    265 F. Supp. 3d 1090 (S.D. Cal. 2017) ...................................................................20

*R.A.V. v. City of St. Paul, Minn.*,
    505 U.S. 377 (1992) .................................................................................................34

*Regents of the Univ. of Calif. v. U.S. Dep't of Homeland Security*,
    908 F.3d 476 (9th Cir. 2018)..........................................................................12, 43, 44

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988) .................................................................................................34

*Romer v. Evans*,
    517 U.S. 620 (1996) .................................................................................................28

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) .................................................................................................34

*Santa Fe Indep. Sch. Dist. v. Doe*,
    530 U.S. 290 (2000) ............................................................................................23, 25

*Schroer v. Billington*,
    577 F. Supp. 2d 293 (D.D.C. 2008) .........................................................................26

*Schwenk v. Hartford*,
    204 F.3d 1187 (9th Cir. 2000).................................................................................27

*Sherbert v. Verner*,
    374 U.S. 398 (1963) .................................................................................................24

*SmithKline Beecham v. Abbott Labs.*,
    740 F.3d 471 (9th Cir. 2014)...............................................................................27, 38

*South Dakota v. Dole*,
    483 U.S. 203 (1987) .................................................................................................36

*Texas Monthly, Inc. v. Bullock*,
    489 U.S. 1 (1989) .....................................................................................................24

*Texas v. Johnson*,
    491 U.S. 397 (1989) .................................................................................................34

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ............................................................................................43

*Estate of Thornton v. Caldor*,
    472 U.S. 703 (1985) ..............................................................................................24, 25

*U.S. v. Virginia*,
    518 U.S. 515 (1996) ..............................................................................................27, 28

*United States v. Morrison*,
    529 U.S. 598 (2000) ......................................................................................................36

*United States v. Sineneng-Smith*,
    910 F.3d 461 (9th Cir. 2018) ........................................................................................34

*Univ. of Texas v. Camenisch*,
    451 U.S. 390 (1981) ......................................................................................................12

*Warsoldier v. Woodford*,
    418 F.3d 989 (9th Cir. 2005) ........................................................................................38

*Weaver v. Nebo Sch. Dist.*,
    29 F. Supp. 2d 1279 (D. Utah 1998) .............................................................................33

*Whitaker v. Kenosha Unified Sch. Dist.*,
    858 F.3d 1034 (7th Cir. 2017) ................................................................................27, 37

*Whole Woman's Health v. Hellerstedt*,
    136 S. Ct. 2292 (2016) ..................................................................................................29

*Windsor v. United States*,
    699 F.3d 169 (2d Cir. 2012), *aff'd on other grounds*, 570 U.S. 744 (2013) ..............................27

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ....................................................................................................13, 42

**Constitution**

U.S. Const. art. I, § 8, cl. 1 ..............................................................................................35

U.S. Const., Amend. I ................................................................................................. *passim*

**Statutes, Rules and Regulations**

76 Fed. Reg. 9968 (Feb. 23, 2011) ..............................................................................18

83 Fed. Reg. 3880 (Jan. 26, 2018) ...............................................................5, 8, 19, 27

84 Fed. Reg. 23,170 (May 21, 2019) ...................................................................... *passim*

5 U.S.C. § 706(2)(A) ..............................................................................................13, 18

5 U.S.C. § 706(2)(C) .................................................................................................20

42 U.S.C. § 238n(a)(1) ....................................................................................4, 21, 22

42 U.S.C. § 238n(a)(2) .....................................................................................4,21, 22

42 U.S.C. § 300a-7(c)(1) ...................................................................................4, 20

42 U.S.C. § 300a-7(c)(2) ..........................................................................................4

42 U.S.C. § 300a-7(d) ....................................................................................5, 20

42 U.S.C. § 300a-7(e) .....................................................................................4, 21

42 U.S.C. § 1395dd(a) .............................................................................................19

42 U.S.C. § 1395dd(b)(1) ..........................................................................................3

42 U.S.C. § 1395dd(b)(c)(1) ...................................................................................19

42 U.S.C. § 2000e(j) .................................................................................................22

42 U.S.C. § 18023(d) .................................................................................................3

42 U.S.C. § 18114 .............................................................................................3, 18

42 U.S.C. § 18116 .........................................................................................3, 19, 22

Age Discrimination Act of 1975
    (42 U.S.C. § 6101 *et seq*) ...............................................................................19

Cal. Health & Saf. Code §§ 10100 and 120100 *et seq.* ........................................36

Cal. Welf. & Inst. Code § 17000 *et seq.* ...............................................................36

Civil Rights Act of 1964 Title VI
    (42 U.S.C. § 2000d *et seq.*) ............................................................................19

Education Amendments of 1972
    (20 U.S.C. § 1681 *et seq.*) ..............................................................................19

Pub. L. 115-245, § 507(d)(1), 132 Stat. 2981 (2018).......................................4, 21, 22

Rehabilitation Act of 1973
    Section 504 (29 U.S.C. § 794 *et seq.*) .............................................................19

**Other Authorities**

119 Cong. Rec. S9377 (Mar. 27, 1973) ...................................................................21

*Black's Law Dictionary* (11th ed. 2019) ...............................................................22

ix

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Cal. Const. art. XI, § 7 ..................................................................................................36

*Merriam-Webster's Collegiate Dictionary* (10th ed. 1996) ...........................................20

Scott Skinner-Thompson, *Outing Privacy*,
    110 Nw. U. L. Rev. 159 (2015)................................................................................32

x

1

## NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

2

PLEASE TAKE NOTICE that on July 17, 2019 or as soon thereafter as they may be heard

3

before Magistrate Judge Nathanael M. Cousins, Plaintiffs will hereby and do move pursuant to Rule

4

65 of the Federal Rules of Civil Procedure and Civil Local Rules 7-2 and 65-2 for a preliminary

5

injunction prohibiting Defendants from enforcing the Final Rule of the Department of Health and

6

Human Services entitled Protecting Statutory Conscience Rights in Health Care, 84 Fed. Reg.

7

23,170 (May 21, 2019) (to be codified at 45 C.F.R. Pt. 88). Without an order from this Court, the

8

Rule will take effect on July 22, 2019, and will cause Plaintiffs to suffer irreparable harm. This

9

motion is based on this notice; the Memorandum of Points and Authorities; the Declarations of

10

Lois Backus (Medical Students for Choice), Elizabeth Barnes (The Women's Centers), Robert

11

Bolan (Los Angeles LGBT Center), Julie Burkhart (Trust Women Seattle), Bruce Butler (County

12

of Santa Clara - Valley Health Plan), Ward Carpenter (Los Angeles LGBT Center), Sara Cody

13

(County of Santa Clara), Darrel Cummings (Los Angeles LGBT Center), Randi Ettner (Plaintiffs'

14

Expert), Roy Harker (AGLP: The Association of LGBTQ+ Psychiatrists), Sarah Henn (Whitman-

15

Walker Health), Paul Lorenz (County of Santa Clara), Alecia Manley (Mazzoni Center), Colleen

16

McNicholas (Trust Women Seattle), Ken Miller (County of Santa Clara's Emergency Medical

17

Services Agency and EMS System), Phuong Nguyen (Santa Clara Valley Medical Center), Rachael

18

Phelps (Medical Students for Choice), Randy Pumphrey (Whitman-Walker Health), Naseema Shafi

19

(Whitman-Walker Health), Adrian Shanker (Bradbury-Sullivan LGBT Community Center),

20

Narinder Singh (County of Santa Clara), Jill Sproul (County of Santa Clara), Toni Tullys (County

21

of Santa Clara Behavioral Health Services Department), Modesto Valle (Center on Halsted), Hector

22

Vargas (GLMA: Health Professionals Advancing LGBTQ Equality); this Court's file; and any

23

matters properly before the Court.

24

## MEMORANDUM OF POINTS AND AUTHORITIES

25

### INTRODUCTION

26

Plaintiffs challenge a regulation, promulgated by the Department of Health and Human

27

Services ("HHS"), that sets out comprehensive new rules for accommodating religious objections

28

in the healthcare context ("the Denial-of-Care Rule" or "Rule"). The Denial-of-Care Rule is

1

unlawful, and it will hurt people across the United States. This Court should enter a preliminary nationwide injunction to freeze the status quo rather than allowing the Rule to take effect.

Over a period of decades, Congress has adopted context-specific statutes to address individuals and entities that do not wish to participate in certain medical procedures or research based on religious or moral objections. These provisions exist against the backdrop of federal laws that protect access to medical treatment, ensure that patients can obtain the information necessary to give informed consent, and prohibit discrimination in the provision of healthcare services. Hospitals and other healthcare organizations have complied with those laws by carefully crafting policies that accommodate religious objections while ensuring that patients receive care.

The Rule completely upends the existing regime by elevating religious objections over the obligation to provide care, even in emergency situations. Through a number of prohibitions and extremely broad definitions, the Rule greatly expands both the universe of healthcare workers who may decline to serve patients based on religious objections, and the activities to which they may object. The Rule specifically invites individuals to refuse to provide care to women seeking reproductive healthcare and to lesbian, gay, bisexual, and transgender ("LGBT") individuals, especially transgender and gender-nonconforming patients seeking gender-affirming and transition-related care.

The Rule severely limits providers' ability to plan for denials of care based on employees' religious objections. Providers must make immediate policy and staffing changes to try to comply. And the Rule authorizes HHS to impose draconian penalties for noncompliance. If HHS believes that a provider (or any contractor or subrecipient of federal funding) has violated the Rule, it can cut off and claw back all of the provider's federal funding. Worst of all, the Rule has no exception for emergencies. Indeed, HHS expressly acknowledged that the Rule may result in patients being denied lifesaving care, but decided that accommodating religious objections was more important.

Health care organizations, doctors, and patients throughout the country will be severely and adversely affected by the Rule. Plaintiffs here are among them. Plaintiffs include the County of Santa Clara ("County"), which operates several hospitals, clinics, a Public Health Department, an emergency medical response system, a behavioral health department, and a health insurance plan;

five private healthcare facilities across the country that provide reproductive-health services and healthcare services for LGBT individuals; four individual physicians and a licensed counselor who work for these entities; three national associations of medical professionals; and two organizations that provide a wide range of services to the LGBT community. They share a common objective of maintaining an effective, functioning healthcare system, one that protects patients' right of access to health services and dignity while respecting healthcare workers' religion-based objections.

The Denial-of-Care Rule is a paradigmatic example of arbitrary and capricious agency action, because HHS failed to appropriately account for harm to patients or to address how providers can ensure continuity of care while complying with the Rule. It directly conflicts with existing federal laws prohibiting discrimination in healthcare and protecting access to care and information. And it goes well beyond the federal statutes on which it is purportedly based. The Rule also is unconstitutional because it favors religion over nonreligion and certain religious beliefs over others; jeopardizes access to reproductive and transition-related healthcare; fosters unlawful discrimination; chills protected expression; and exceeds Congress's Spending Clause authority. Plaintiffs, their members, and their patients will suffer irreparable, nationwide harm if the Rule goes into effect. This Court should enjoin the Rule.

## STATEMENT OF FACTS

### A.   Congress's Consideration Of Religious Objections And The Needs Of Patients

A number of federal laws ensure that patients receive prompt and nondiscriminatory access to medical care. They include the Patient Protection and Affordable Care Act ("ACA"), which prohibits the Secretary of HHS from promulgating any regulation that impedes timely access to healthcare, creates unreasonable barriers to receiving care, or restricts the ability of providers to provide healthcare information to patients, 42 U.S.C. § 18114, and prohibits discrimination in the provision of healthcare services, 42 U.S.C. § 18116. They also include the Emergency Medical Treatment and Labor Act ("EMTALA"), which requires hospitals to either treat or transfer patients in unstable medical conditions. 42 U.S.C. § 1395dd(b)(1); *see* 42 U.S.C. § 18023(d) (reiterating that healthcare providers must "provid[e] emergency services as required by State or Federal law").

1      Against this backdrop, Congress has enacted statutes that prohibit discrimination against

2 individuals and entities that refuse, based on religious beliefs or moral convictions, to participate

3 in certain medical procedures, training, or research. HHS relies on those statutes as the basis for the

4 Denial-of-Care Rule. Each statute was enacted to address a particular, limited context. None of

5 them overrides the statutes that protect access to information and care; prohibit discrimination

6 against patients; and require healthcare providers to treat patients in emergency situations.

7      For example, the Weldon Amendment addresses persons and entities who do not wish to

8 participate in abortion care. It states that no funds appropriated under a particular appropriations

9 statute "may be made available to a Federal agency or program, or to a State or local government,"

10 if the recipient "subjects any institutional or individual healthcare entity to discrimination on the

11 basis that the healthcare entity does not provide, pay for, provide coverage of, or refer for

12 abortions." Pub. L. 115-245, § 507(d)(1), 132 Stat. 2981, 3118 (2018). The Coats-Snowe

13 Amendment addresses the more specific context of training to provide abortion. It states, among

14 other things, that "[t]he Federal Government, and any State or local government that receives

15 Federal financial assistance," may not discriminate against a healthcare entity because "the entity

16 refuses to undergo training in the performance of induced abortions," "to require or provide such

17 training," "to perform such abortions," "to provide referrals for such training or such abortions," or

18 "to make arrangements" for them. 42 U.S.C. § 238n(a)(1), (a)(2).

19      The Church Amendments arose in the context of biomedical research. Among other

20 requirements, they prohibit recipients of "biomedical or behavioral research" funds from

21 discriminating against personnel because they performed or assisted in the performance of a

22 research or healthcare activity, or refused to do so because of "religious beliefs or moral

23 convictions." 42 U.S.C. § 300a-7(c)(2). They also prohibit recipients of certain federal funds from

24 discriminating in employment against physicians or health care personnel because they "performed

25 or assisted in the performance of a lawful sterilization procedure or abortion" or refused to do so,

26 *id.* § 300a-7(c)(1), and prohibit recipients of certain federal funds from discriminating against

27 applicants for training or study based on their "reluctance, or willingness, to counsel, suggest,

28 recommend, assist, or in any way participate in abortions or sterilizations," *id.* § 300a-7(e). Finally,

they provide that "[n]o individual shall be required to perform or assist in the performance of any part of a health service program or research activity funded . . . under a program administered by [HHS]" if the activity "would be contrary to his religious beliefs or moral convictions." *Id.* § 300a-7(d).[1]

Each of these statutes is carefully worded and narrowly drawn. None purports to extend an all-purpose religious-objection right to every person employed by a healthcare provider. And Congress has never suggested that religious objections take priority over the needs of patients or the healthcare system.

## B. The Administration's Decision To Disrupt The Existing Scheme By Promulgating The Denial-of-Care Rule

The Trump Administration promulgated the Rule as the centerpiece of an aggressive plan to favor religious objectors over patients. On January 18, 2018, the Acting Secretary of HHS established a new Conscience and Religious Freedom Division in the agency's Office for Civil Rights ("OCR"). The next week, the Acting Secretary proposed the Rule. 83 Fed. Reg. 3880 (Jan. 26, 2018).

More than 242,000 comments were filed by medical associations, medical providers, civil-rights organizations, state and local governments, and others. *See* 84 Fed. Reg. 23,170, 23,180 & n.41 (May 21, 2019). Many of those comments were critical of the Rule. The comments explained that the Rule's expansive new provisions would upset well-developed practices by healthcare providers, medical schools, and other healthcare organizations that respect religious objections without compromising patient care. *E.g.*, American Medical Association ("AMA") Cmt. Ltr. 3, 5 (HHS-OCR-2018-0002-70564).[2] They also explained that the Rule conflicts with federal and state nondiscrimination and emergency-care laws, and that the Rule will cause providers to deny healthcare, including lifesaving care, to patients, particularly patients seeking reproductive healthcare and LGBT patients. *See*, *e.g.*, AMA Cmt. Ltr. 5-6; Cnty. of Santa Clara Cmt. Ltr. 4-8

---

[1] HHS cited a laundry list of statutes as potentially authorizing the Rule, 84 Fed. Reg. at 23,171-23,172; this motion addresses the regulatory provisions and statutes most relevant to Plaintiffs.

[2] All comments are available on the official "regulations.gov" website, under Docket ID HHS-OCR-2018-0002, at https://www.regulations.gov/docket?D=HHS-OCR-2018-0002.

(HHS-OCR-2018-0002-54930); Ctr. for Reproductive Rights ("CRR") Cmt. Ltr. 2-5 (HHS-OCR-2018-0002-71830).

On May 21, 2019, HHS published the final Rule, with only modest changes from the proposed Rule. *See* Protecting Statutory Conscience Rights in Health Care, 84 Fed. Reg. 23,170 (May 21, 2019) (to be codified at 45 C.F.R. Pt. 88). Although HHS's mission is to "enhance the health and well-being of all Americans," HHS, *Introduction: About HHS*, http://www.hhs.gov/about/strategic-plan/introduction/index.html, in promulgating the Rule HHS decided that its "singular and critical responsibility" was "to vigorously enforce" federal religious-objection laws. 84 Fed. Reg. at 23,178. Despite many concerns raised in the comments, HHS did not sufficiently address what providers must do to comply with the Rule and what options providers have to ensure continuity of care, especially in emergency circumstances. *Id.* at 23,183, 23,191-23,192.

### C.   What The Denial-Of-Care Rule Does

The Rule goes well beyond the narrowly drawn statutes that Congress enacted to address religion-based objections. It creates a new regime that vastly expands the power of religious objectors at the expense of providers, physicians, and patients. The Rule does this by repeating statutory prohibitions and then defining key statutory terms broadly (more broadly than Congress intended) and applying them across-the-board, rather than in the limited contexts Congress specified. The resulting Rule is completely unmoored from the statutes purportedly authorizing it.

The Rule prohibits all recipients of federal funding from requiring any "**individual** to perform or **assist in the performance of** any part of a health service program or research activity" if that performance or assistance would be contrary to the person's religious or moral beliefs. 84 Fed. Reg. at 23,265, § 88.3(a)(2)(vi) (emphasis added). The Rule's definitions expand this prohibition to reach virtually any person or activity in some way tied to a healthcare procedure. "Individual" may include any member of an entity's "workforce," *id.* at 23,199, and "workforce" includes any "employee[], volunteer[], trainee[], [or] contractor" subject to the control of, or holding privileges with, a healthcare entity. *Id.* at 23,264, § 88.3. "Assist in the performance" is not limited to direct participation in a patient's medical treatment. Instead, it means taking any action

"that has a specific, reasonable, and articulable connection to furthering a procedure or a part of a health service program or research activity undertaken by or with another person or entity," and may include "counseling, **referral**, training, or otherwise making arrangements for the procedure." 84 Fed. Reg. at 23,263, § 88.2 (emphasis added). "Referral," in turn, includes giving any information in virtually any form if the "purpose or reasonably foreseeable outcome" is to "assist a person in receiving funding or financing for, training in, obtaining, or performing a particular health care service, program, activity, or procedure." *Id*. at 23,264, § 88.2.

Together, these provisions invite individuals who are only tangentially involved in patient care to raise religion-based objections and deny patients needed care and information. Objections may be raised by a receptionist who schedules appointments, a janitor who prepares an operating room, an orderly who assists patients in the recovery room, or an ambulance driver who transports a patient to the hospital. *See* 84 Fed. Reg. at 23,186-23,187. And these objections may be to virtually any healthcare-related task, including providing information about treatment options; escorting patients to treatment areas; cleaning or restocking treatment rooms, ambulances, or other facilities; providing, collecting, or filing forms related to patients' health history or insurance information; billing or administering insurance reimbursements; and even scheduling appointments.

The Rule also prohibits "**discrimination**" against individuals and entities that assert certain religious objections. *See*, *e.g.*, 84 Fed. Reg. at 23,265-23,266, §§ 88.3(a)(2)(iv)-(vi), (b)(2) and (c)(2) (emphasis added). The Rule defines "discriminate" to include virtually any negative action—including any action to "withhold, reduce, exclude from, terminate, restrict, or make unavailable or deny" any "position," "status," "benefit," or "privilege" in employment, or to use any "policies[] or procedures" that subject an individual or entity to "any adverse treatment." 84 Fed. Reg. at 23,263, § 88.2.

The definition includes carve-outs for accommodating objections, but those provisions severely constrain the ability of healthcare entities to ensure that patients receive needed care. For example, the Rule says that an employee may "voluntarily accept[]" an accommodation offered by the employer, *id.*, but it does not authorize employers to impose reasonable accommodations over an employee's objections, even when necessary to protect patients' health. The Rule also limits

1   employers' ability to identify potential objections in advance. A covered entity may require a

2   worker to inform it of his or her objections, but only if objections are reasonably likely, and the

3   entity can inquire about objections only "after . . . hiring" the worker and "once per calendar year

4   thereafter, unless supported by a persuasive justification." *Id*. And on its face, the Rule precludes

5   providers from requiring objectors to cooperate in ensuring that patients receive appropriate care

6   and information. *See id*. (a covered entity may "use alternate staff or methods to provide or further

7   any objected-to conduct" only if the entity "does not require any additional action by" the objector).

8       The Rule targets reproductive healthcare and healthcare to LGBT patients. It contemplates

9   that employees may object to tasks even tangentially related to abortion and to emergency treatment

10  of life-threatening ectopic pregnancies. *See* 84 Fed. Reg. at 23,186-23,188. And it repeatedly

11  characterizes medically necessary healthcare procedures sought by transgender patients to treat

12  gender dysphoria as "sterilization," inviting religious and moral objections to providing that care.

13  *See id*. at 23,178 (citing *Minton v. Dignity Health*, No. 17-558259 (Calif. Super. Ct. Apr. 19, 2017),

14  involving a Catholic hospital's attempt to block a transgender patient's hysterectomy, which was

15  part of a course of treatment for gender dysphoria); *see also id.* at 23,205. Equating treatment for

16  gender dysphoria with "sterilization" is medically inaccurate and contrary to the plain meaning of

17  the term, and it endorses a particular religious view of gender identity. Ettner Decl. ¶ 46. Procedures

18  undertaken for the purpose of sterilization are distinct from procedures undertaken for other

19  purposes that incidentally affect reproductive function. *Id*.; Valle Decl. ¶ 13. For some transgender

20  people who desire children, reproduction may be possible even after completing treatment for

21  gender dysphoria. Ettner Decl. ¶ 47; Valle Decl. ¶ 13.

22      Significantly, the Rule contains no emergency exceptions. No emergency exceptions appear

23  on the face of the Rule, and the Rule's disapproval of cases and a medical-ethics opinion requiring

24  medical personnel to provide emergency care makes clear that HHS intends for religious objections

25  to take precedence over saving patients' lives. *See* 84 Fed. Reg. at 23,176; 83 Fed. Reg. at 3888.

26  Although serious concerns were raised during the notice-and-comment period about the need to

27  provide emergency care, HHS's only response is that it will evaluate those situations on a case-by-

28  case basis. 84 Fed. Reg. at 23,176. Of course, by then it will be too late for some patients.

The Rule threatens entities with severe penalties. It authorizes withdrawal and clawback of all federal funding, even for programs unrelated to healthcare. *See* 84 Fed. Reg. at 23,180; *id.* at 23,271, § 88.7(i). And it holds healthcare providers responsible not only for their own violations of the Rule, but also any violations by contractors or subrecipients. *See id.* at 23,270, § 88.6(a); *id.* at 23,207. The Rule mandates investigations whenever "any information" demonstrates a "threatened" or "potential" violation, *id.* at 23,271, § 88.7(d), which may include review of confidential information. *Id.* at 23,271, § 88.6(c). The Rule provides no mechanisms for notice, a hearing, or an appeal before HHS terminates or withholds funds. *Id.* at 23,271-23,272, § 88.7(h)(2). OCR "will consider an entity's voluntary posting of a notice of nondiscrimination" including its recommended text as "non-dispositive evidence of compliance." *Id.* at 23,270, § 88.5. But posting of the notice is only *nondispositive evidence* of compliance. There is no safe harbor—not for providers, not for doctors, and not for patients.

### D.   How The Denial-Of-Care Rule Will Harm Doctors, Patients, and Healthcare Providers

The Denial-of-Care Rule will severely harm Plaintiffs, their members, and their patients. And these effects will be felt by healthcare providers and patients nationwide.

Put simply, the Rule will hurt people, and likely kill some of them. HHS envisioned that any worker who objects to a certain patient or the patient's requested healthcare procedure may refuse to participate in the patient's treatment. As a result, some patients will not receive necessary information and care, including time-sensitive and emergency care—putting their health at substantial risk.

The Rule increases the likelihood that patients will be turned away, without a referral or even basic information about their condition or treatment options. When a patient is turned away, that person (at the very least) will have to incur additional costs and burdens to try to find a willing provider of the needed healthcare. Lorenz Decl. ¶ 24; McNicholas Decl. ¶ 31; Cummings Decl. ¶ 9. Those burdens will fall most heavily on low-income individuals. Bolan Decl. ¶ 2; Cummings Decl. ¶¶ 3-4. Some patients will not receive the necessary treatment—either because they cannot obtain it in time, because they do not have the resources to obtain it somewhere else, or because there is

9

no other provider in the area. Shanker Decl. ¶ 5; Valle Decl. ¶ 5; Cummings Decl. ¶ 11. And being turned away is a potentially traumatizing and stigmatizing experience. Shafi Decl. ¶ 18; Valle Decl. ¶ 15; Bolan Decl. ¶¶ 6-9; Henn Decl. ¶ 3; McNicholas Decl. ¶ 44; Ettner Decl. ¶¶ 48, 56. These harms will be especially acute for patients seeking reproductive healthcare and for LGBT patients. HHS knows this: It cited examples of individuals objecting to reproductive care and care sought by LGBT individuals as evidence of the need for the Rule. 84 Fed. Reg. at 23,176 & n.27.

The Rule threatens to impede or eliminate access to abortion and contraception. Burkhart Decl. ¶¶ 24-28; Backus Decl. ¶¶ 27-28. Abortion is a common and safe medical procedure. McNicholas Decl. ¶¶ 28, 30. Yet there is a national shortage of abortion providers in the United States, and their numbers are shrinking. McNicholas Decl. ¶¶ 19-21; Backus Decl. ¶ 8. As a result, many patients already must travel long distances (and incur associated costs and delays) to obtain care. Phelps Decl. ¶ 18. Delays in obtaining an abortion compound the logistical and financial burdens that patients face and substantially increase the health risks to patients. Phelps Decl. ¶ 18; McNicholas Decl. ¶ 30. If the Rule goes into effect, the United States will see an even more dramatic reduction in the number of large medical institutions that provide abortions and that teach students and residents about them. Phelps Decl. ¶ 30; Backus Decl. ¶¶ 38-39.

The Rule imposes particular burdens on LGBT individuals, and especially transgender and gender-nonconforming individuals. LGBT people already face acute health disparities and barriers to care, problems which will be compounded by the Rule. Shanker Decl. ¶¶ 5-10; Ettner Decl. ¶¶ 55-56; Cummings Decl. ¶¶ 8-11. A majority of LGBT patients fear going to healthcare providers because of past experiences of anti-LGBT bias in healthcare. Shanker Decl. ¶ 8; Ettner Decl. ¶ 55; Henn Decl. ¶ 3; Vargas Decl. ¶ 5; Bolan Decl. ¶ 9; Cummings Decl. ¶ 9. Many LGBT patients report hostility, discrimination, and denials of care when they disclosed to healthcare providers their sexual orientation, history of sexual conduct, gender identity, transgender status, or past gender-affirming medical treatment. Shanker Decl. ¶¶ 6-10; Henn Decl. ¶¶ 3, 6-8; Bolan Decl. ¶¶ 6-9; Carpenter Decl. ¶ 5; Cummings Decl. ¶ 12; Vargas Decl. ¶¶ 4, 13; McNicholas Decl. ¶ 26; Ettner Decl. ¶ 55. LGBT patients are disproportionately likely to delay preventive screenings and necessary medical treatment, which results in more acute health problems and more adverse

outcomes. Shanker Decl. ¶¶ 8-12; Henn Decl. ¶ 3; Bolan Decl. ¶¶ 6-9; Carpenter Decl. ¶ 6; Manley Decl. ¶ 8; Cummings Decl. ¶¶ 9, 12. The Rule makes it more likely that these patients will be denied care or will avoid seeking care altogether, which will hurt not only the patients but also public health. Bolan Decl. ¶ 11; Cummings Decl. ¶ 9; Henn Decl. ¶¶ 3, 6. The Rule also encourages these patients to remain closeted when seeking medical care, which similarly harms patients and public health. Shanker Decl. ¶¶ 11-12; Vargas Decl. ¶ 14; Henn Decl. ¶ 5; Bolan Decl. ¶¶ 8-10; Carpenter Decl. ¶ 11; Manley Decl. ¶ 8; Harker Decl. ¶ 14; Cummings Decl. ¶¶ 13-14.

Under the Rule, healthcare providers, including the County of Santa Clara, will face serious impediments to providing high-quality and timely healthcare. First, they will immediately have to reevaluate and rewrite their existing religious-objection, staffing, and emergency policies. *See* Lorenz Decl. ¶¶ 19-20; Miller Decl. ¶ 7; Butler Decl. ¶ 5; Singh Decl. ¶ 7; Sproul Decl. ¶¶ 4-6; Tullys Decl. ¶ 9. They also will need to inquire as to the conscience objections of the many employees, contractors, and volunteers who are newly covered under the Rule. For example, Santa Clara Valley Medical Center, a hospital operated by the County, has a policy allowing current and prospective medical staff and employees to request in writing not to participate in certain patient care that conflicts with staff members' cultural values, ethics, or religious beliefs, with the understanding that medical emergencies take precedence over personal beliefs. Lorenz Decl. ¶¶ 11, 18; Nguyen Decl. ¶ 4. If the County can no longer rely on all staff to provide care in an emergency, it will have to consider whether backup or double staffing is necessary to protect patient welfare, which will strain the hospital's budget. Nguyen Decl. ¶ 6; Lorenz Decl. ¶ 19. Other aspects of the Rule also conflict with the County's policies and operational needs and could undermine patient care. Lorenz Decl. ¶¶ 15-17, 20-21; Nguyen Decl. ¶ 7. And if despite a provider's best efforts, an OCR official believes that the provider failed to comply, the provider could lose all Medicare and Medicaid reimbursements and other federal funding—which obviously would affect its ability to continue providing care to patients. Lorenz Decl. ¶¶ 22-24; Tullys Decl. ¶ 8; Cody Decl. ¶¶ 12-22.

The Rule imposes special challenges for providers specializing in reproductive healthcare and healthcare for LGBT individuals. Like the County, they must reevaluate their existing policies, and may be forced to consume precious resources with unnecessary workarounds and duplicative

staffing; to unfairly burden nonobjecting employees; to reduce services; and even to close programs. Shafi Decl. ¶¶ 12-15; Shanker Decl. ¶¶ 13-15; Valle Decl. ¶¶ 16-23; Cummings Decl. ¶¶ 15-19; Manley Decl. ¶¶ 10-13; Burkhart Decl. ¶¶ 19-21, 27; Barnes Decl. ¶ 22. Also like the County, providers that specialize in reproductive healthcare and healthcare for LGBT patients could face situations in which a staff member unexpectedly objects to care, leading to staffing issues and inadequate emergency care. But the reproductive and LGBT care providers will be especially affected by the Rule, because more patients who fear refusal of care at traditional healthcare facilities will come to them for care, straining their already limited resources. Shafi Decl. ¶ 20; Cummings Decl. ¶ 15; Shanker Decl. ¶ 13; Barnes Decl. ¶¶ 30-31. And for those providers of last resort, the ability to provide seamless emergency treatment to a patient can mean the difference between life and death. Henn Decl. ¶ 9 (Whitman-Walker staff administered medication to reverse a life-threatening overdose after emergency medical services personnel expressed disapproval of the patient and refused treatment); Carpenter Decl. ¶ 5 (LA LGBT Center provided care to transgender patient after medical conditions became life-threatening because other providers denied care). Those providers also will need to invest resources in educating the community about the Rule and in battling the erosion of community members' confidence in the healthcare system that will result from the Rule's application. Shanker Decl. ¶ 14; Valle Decl. ¶ 16.

Finally, the Rule will harm Plaintiff medical associations by frustrating their missions of promoting training in abortion care (Backus Decl. ¶ 11) and nondiscriminatory care for LGBT patients (Vargas Decl. ¶¶ 1-2, 6-8; Harker Decl. ¶¶ 1, 6, 9) throughout the country. The Rule also will harm their members and their members' patients by encouraging denials of care. *See* Harker Decl. ¶¶ 6, 9; Backus Decl. ¶ 11; Vargas Decl. ¶¶ 6-10.

## ARGUMENT

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). A plaintiff seeking a preliminary injunction must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Regents of the*

*Univ. of Calif. v. U.S. Dep't of Homeland Security*, 908 F.3d 476, 505 n.20 (9th Cir. 2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). In applying this standard, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (internal quotation marks omitted).

Those requirements are met here. Plaintiffs are likely to succeed in proving that the Denial-of-Care Rule is unlawful on several grounds, including that it violates the Administrative Procedure Act ("APA") because it is arbitrary and capricious, conflicts with existing statutes, and goes far beyond HHS's statutory authority, and that it is unconstitutional. The irreparable injury is clear: Plaintiffs' patients will be harmed if the Rule goes into effect, and Plaintiffs themselves will face immediate and substantial burdens to delivering healthcare and fulfilling their missions. At the same time, the government will not be harmed if the Court delays the Rule's effective date to address the Rule's many problems. And the public interest plainly favors preventing the Rule from taking immediate effect. Because Plaintiffs are located throughout the country and include nationwide organizations, and the threatened harms will occur nationwide, the Court should issue a nationwide injunction.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.    Plaintiffs Are Likely To Succeed In Demonstrating that The Rule Violates the APA

#### 1.    The Rule is Arbitrary and Capricious

The APA requires courts to "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency rule is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider," "entirely failed to consider an important aspect of the problem," or "offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency must "examine the relevant data and articulate a satisfactory explanation for its action" that includes a "rational connection between the facts found and the choice made." *Id.* (internal

quotation marks omitted). When an agency has failed to "give adequate reasons for its decisions," failed to "examine[] the relevant data," or failed to offer a "rational connection between the facts found and the choice made," the regulation must be set aside. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). Because the failure to satisfy that threshold requirement makes the regulation procedurally defective, the reviewing court need not reach any argument for deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). *Encino Motorcars, LLC*, 136 S. Ct. at 2125.

HHS acted arbitrarily and capriciously in promulgating the Denial-of-Care Rule. It adopted a one-sided regulation that is not supported by (and is in fact contrary to) the evidence in the administrative record, and it failed to address important issues raised during the notice-and-comment process. These problems are particularly apparent with respect to two issues: harms to patients, and providers' need to reconcile religious objections with their obligation to provide healthcare.

### a. Harm to Patients

The Rule will harm patients by causing some providers to deny them necessary healthcare and information. HHS knew that. *E.g.*, 84 Fed. Reg. at 23,251. Yet HHS made no effort to quantify the effects of the Rule on patients or to take steps to reduce or avoid those harms.

HHS received voluminous comments demonstrating that religious-objection laws have been exploited and misused to delay or deny care, particularly for patients seeking reproductive healthcare and LGBT patients. Many patients already face discrimination and other barriers to care. *See*, *e.g.*, Cnty. of Santa Clara Cmt. Ltr. 5-6; CRR Cmt. Ltr. 4-5. Healthcare providers have refused to treat LGBT patients and their children, even in emergencies. Cnty. of Santa Clara Cmt. Ltr. 5-6. Many LGBT people and people living with HIV have reported providers refusing to touch them or using excessive precautions, using harsh or abusive language, being physically rough or abusive, or shaming them or blaming them for medical conditions. GLMA Cmt. Ltr. 1-2 (HHS-OCR-2018-0002-71703). In a recent study, over one-third of transgender patients reported at least one negative experience related to their gender identity when seeking medical care. *Id.* at 2.

Providers also have denied access to safe pregnancy termination, miscarriage management,

and contraception, all of which are necessary to ensure women's health and well-being. Rape survivors have been denied emergency contraception; pharmacists have refused to provide emergency contraception in time to prevent pregnancy; and hospitals have denied women care to complete miscarriages even when their lives were in danger. CRR Cmt. Ltr. 2-3. If the Rule takes effect, individuals and entities likely will assert religious objections to a much wider variety of care, including reproductive care, transgender care, counseling for same-sex partners, and HIV/AIDS treatment. Lambda Legal Cmt. Ltr. 4-6 (HHS-OCR-2018-0002-72186). Those denials of care will disproportionately affect economically disadvantaged patients. *See*, *e.g.*, CRR Cmt. Ltr. 3-5, 10, 25-26. Worse yet, the Rule includes no exceptions for emergencies, so patients will suffer these harms even when they are seeking lifesaving care. Shafi Decl. ¶¶ 14-15; Henn Decl. ¶¶ 6, 9; Valle Decl. ¶ 22.

The Rule does not adequately address those concerns. HHS acknowledged that "[d]ifferent types of harm can result from denial of a particular procedure," including that a "patient's health might be harmed if an alternative is not readily found, depending on the condition." 84 Fed. Reg. at 23,251. HHS also recognized that a patient denied care likely will incur additional costs in searching for an alternative, and "the patient may experience distress associated with not receiving a procedure he or she seeks." *Id.* And HHS recognized that the Rule would adversely affect "rural communities, underprivileged communities, or other communities that are primarily served by religious healthcare providers or facilities." *Id.* at 23,180.

HHS had essentially two responses to those acknowledged problems: to hypothesize that more doctors would be available overall (but only to provide certain treatments), and to blame the adverse impacts on the underlying statutes rather than the Rule. First, HHS suggested that the Rule would "increase, not decrease, access to care" by attracting providers who otherwise would not practice medicine because of their religious objections. 84 Fed. Reg. at 23,180. HHS's only support for this assertion was a small, outdated, and unreliable political poll, *id.* at 23,181, which acknowledged that it was "not intended to be representative of the entire medical profession" or

1    even of the membership of the faith-based medical-organizations surveyed.[3] HHS cited no data

2    showing that the Rule was needed to keep providers from quitting or that it would attract any new

3    providers to underserved communities. And HHS failed to acknowledge that attracting these new

4    providers would not solve the problem; increasing the number of providers that refuse to provide

5    certain medical treatments does nothing to help patients who need those treatments.

6          Second, HHS wrongly attributed the harmful effects of the Rule to the purportedly

7    authorizing statutes. For example, HHS's response to the concern that refusals will cause patients

8    significant distress is that, in the agency's view, Congress did not want to "establish balancing tests

9    that weigh such emotional distress against the right to abide by one's conscience." 84 Fed. Reg. at

10   23,251. But Congress made no such policy judgment: It established protections for religious

11   objectors but also enacted statutes ensuring that patients would not be harmed. *See* pp. 3-5, *supra*.

12   The *Rule* is what elevates religious objections over the health of patients, and that was a judgment

13   *HHS* made.

14         HHS ultimately both failed to quantify the harms to patients and failed to give them

15   appropriate weight. HHS decided that it was "appropriate" to finalize the Rule "even though the

16   Department and commenters do not have data capable of quantifying all of its effects on the

17   availability of care." 84 Fed. Reg. at 23,182. HHS also decided that religious refusals were "worth

18   protecting even if they impact overall or individual access to a particular service, such as abortion."

19   *Id.* That is true even for emergencies: All HHS would say about ensuring emergency care is that it

20   would consider specific scenarios on a case-by-case basis. *Id.* at 23,176. And HHS did not address

21   whether existing policies that accommodate objections but ensure patient care would be equally

22   effective and less harmful. By failing to account for and give appropriate weight to the many likely

23   harms to patients, and by failing to consider alternatives to lessen or ameliorate those harms, HHS

24   acted arbitrarily and capriciously.

25               **b.    *Providers' Need to Reconcile Religious Objections With Providing***
                          ***Healthcare***

26

27   _____
     [3] *See* "Key Findings on Conscience Rights Polling," Memorandum from Kellyanne Conway to
     Interested Parties at 4 (April 8, 2009),  available at https://docs.wixstatic.com/ugd/809e70_2f66d

28   15b88a0476e96d3b8e3b3374808.pdf. The Rule cites the Memorandum at this URL. *See* 84 Fed.
     Reg. at 23,247 n. 316-318.

1    HHS likewise failed adequately to address how providers can fulfill their missions and

2    provide healthcare while complying with the Rule. The Rule greatly expands the universe of

3    workers who may assert religious objections and the activities to which they may object. And it

4    severely constrains providers' ability to ensure that these objections do not compromise patient

5    care, especially in emergencies. The agency's action will place systematic and significant burdens

6    on covered entities and expose them to incredibly punitive sanctions. HHS was required to justify

7    those burdens and sanctions. *See Encino Motorcars*, 136 S. Ct. at 2126. It failed to do so.

8    Commenters explained that hospitals and other healthcare organizations already have

9    policies that allow individuals to opt out of certain procedures on religious or moral grounds while

10   ensuring that patients still will receive care. *See, e.g.*, AMA Cmt. Ltr. 5; Cnty. of Santa Clara Cmt.

11   Ltr. 2; S.F. Dep't of Public Health Cmt. Ltr. 2-3 (HHS-OCR-2018-0002-69109); Boston Med. Ctr.

12   Cmt. Ltr. 2-3 (HHS-OCR-2018-0002-70407); Mass. Med. Soc'y Cmt. Ltr. 1 (HHS-OCR-2018-

13   0002-62998). Those policies often require workers to assist in providing emergency care. Sproul

14   Decl. ¶¶ 8, 10; Lorenz Decl. ¶¶ 18-19; Burkhart Decl. ¶ 21. Commenters expressed concern that

15   the Rule would call those existing policies into question and would restrict providers' ability to

16   require advance notice of objections and to reassign staff to positions where their objections would

17   not result in harm to patients. *E.g.*, S.F. Cmt. Ltr. 3; N.Y. City Cmt. Ltr. 3 (HHS-OCR-2018-0002-

18   71028); Am. Nurses Ass'n Cmt. Ltr. 8 (HHS-OCR-2018-0002-55870). Commenters also urged

19   HHS not to allow religious objections to take precedence over emergency care. *E.g.*, Boston Med.

20   Ctr. Cmt. Ltr. 6; Nat'l Inst. for Reproductive Health Cmt. Ltr. 13 (HHS-OCR-2018-0002-56426).

21   Rather than craft a rule that addressed and resolved these well-founded concerns, HHS

22   effectively ignored them. HHS acknowledged that providers will have to change their existing

23   policies to provide much greater accommodations for religious objectors. *See, e.g.*, 84 Fed. Reg. at

24   23,191. But HHS provided little guidance on which policies would be allowed. For example, the

25   agency did not explain (1) whether providers may require objectors to assist in emergencies, *id.* at

26   23,183, 23,188; (2) how to proceed when an employee rejects a proposed accommodation, *id.* at

27   23,263; or (3) what providers may do when workers disclose after hiring that they are unwilling to

28   perform the essential functions of a position, *id.* The result is that covered entities have inadequate

1   notice of what they can and cannot do to protect patients while accommodating religious objections

2   under the Rule. HHS acted arbitrarily and capriciously by failing to account for providers'

3   legitimate concerns and instead leaving those issues to the discretion of individual OCR officials—

4   especially when all of the providers' federal funding is on the line.

5              **2.      The Rule Conflicts With Existing Healthcare Laws**

6              The Rule is "not in accordance with law," 5 U.S.C. § 706(2)(A), because it conflicts with a

7   number of federal statutes that protect patients' access to care—especially emergency care—and

8   that prohibit discrimination in the provision of healthcare.

9              *a.      ACA—Access to Care and Information*

10             The ACA expressly prohibits the Secretary of HHS from "promulgating any regulation that"

11  "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care,"

12  "impedes timely access to health care services," "interferes with communications regarding a full

13  range of treatment options between the patient and the provider," "restricts the ability of health care

14  providers to provide full disclosure of all relevant information to patients making health care

15  decisions," or "violates the principles of informed consent and the ethical standards of health care

16  professionals." 42 U.S.C. § 18114.

17             The Rule violates each of those provisions. It will prevent individuals from obtaining

18  needed healthcare, especially LGBT patients and patients seeking reproductive care. Phelps Decl.

19  ¶ 43; McNicholas Decl. ¶ 28; Ettner Decl. ¶¶ 48, 56. It also will prevent patients from obtaining

20  information about certain healthcare procedures and will chill patients, especially LGBT patients,

21  from discussing their healthcare needs. Valle Decl. ¶ 19; Cummings Decl. ¶¶ 9, 14. As a result,

22  those patients will not have the information necessary to provide informed consent. *See* McNicholas

23  Decl. ¶ 18; 76 Fed. Reg. 9968, 9973 (Feb. 23, 2011) (explaining informed consent). In short, the

24  Rule expressly and wholeheartedly does exactly what Congress prohibited in the ACA.

25             *b.      EMTALA*

26             EMTALA requires hospitals with emergency rooms to provide appropriate care to patients

27  in emergencies. Under EMTALA, hospitals with emergency departments must provide "an

28  appropriate medical screening examination within the capability of the hospital's emergency

1   department" to determine if a medical emergency exists. 42 U.S.C. § 1395dd(a). In a medical

2   emergency, the hospital must either treat the patient "to stabilize the medical condition" or transfer

3   the patient "to another medical facility" for treatment (which for a non-stable patient may be done

4   only with a doctor's consent). *Id.* § 1395dd(b), (c)(1).

5          The Denial-of-Care Rule contravenes the clear directive of EMTALA to provide care to

6   patients in distress. The Rule gives expansive protections to religious objectors and does not make

7   exceptions for emergencies. The Rule invites any emergency room employee with a religious

8   objection to decline to provide, or assist in providing, emergency services. *See* 84 Fed. Reg. at

9   23,176; 83 Fed. Reg. at 3888. Under the Rule, the provider apparently cannot require that individual

10  even to assist with a transfer to another facility where the patient can obtain care. *See* 84 Fed. Reg.

11  23,186-23,187. And the Rule does not allow hospitals to make the scheduling and staffing decisions

12  necessary to ensure that patients facing emergencies receive treatment, because it severely limits

13  their ability to ask about religious objections and to reassign workers with religious objections to

14  other positions. *See* pp. 7-8, *supra*. As a result, under the Rule, providers likely will not be able to

15  fulfill their statutory obligations to examine patients in distress and provide emergency care, or at

16  the very least transfer the patients to hospitals where they can receive the necessary care.

17                              ***c.*     *ACA—Nondiscrimination***

18         The ACA prohibits discrimination in the provision of healthcare. Specifically, 42 U.S.C.

19  § 18116 prohibits discrimination against individuals in any health program or activity on grounds

20  prohibited by Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*), Title IX of the

21  Education Amendments of 1972 (20 U.S.C. § 1681 *et seq.*), the Age Discrimination Act of 1975

22  (42 U.S.C. § 6101 *et seq.*), or Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794 *et*

23  *seq.*). These statutes prohibit discrimination on the basis of race, color, national origin, age, sex, or

24  disability.

25         The Denial-of-Care Rule directly conflicts with that nondiscrimination mandate. A

26  provider's refusal to treat patients based on religious or moral objections may exclude certain

27  patients from health care programs on grounds prohibited by the ACA. For instance, the Denial-of-

28  Care Rule invites individuals to deny transgender individuals healthcare on the basis of sex. *See,*

*e.g.,* 84 Fed. Reg. at 23,178. Such conduct is prohibited under Title IX, as expressly incorporated by the ACA. *See Boyden v. Conlin*, 341 F. Supp. 3d 979, 1000 (W.D. Wis. 2018); *Prescott v. Rady Children's Hospital-San Diego*, 265 F. Supp. 3d 1090, 1099 (S.D. Cal. 2017). The Rule gives objectors new license to discriminate, rather than enforcing Congress's prohibitions on discrimination.

### 3.      The Rule Goes Beyond HHS's Statutory Authority

An agency may act only within the authority Congress gives it. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Courts reviewing agency action must "hold unlawful and set aside" actions that exceed the agency's statutory jurisdiction. 5 U.S.C. § 706(2)(C).

The Rule goes well beyond the statutes purportedly authorizing it. Each of those statutes provided a particular protection for religious objectors in a specific context. Those statutes are self-executing, and none expressly grants HHS enforcement authority. Nonetheless, HHS decided to assert the authority to enforce those statutes, then attempted to vastly expand their reach. It did so by defining key statutory terms much more broadly than Congress could possibly have intended, and then combining those terms even though Congress kept them separate. Because those definitions and that combination are inconsistent with the statutes that HHS purports to construe, the Rule is unlawful. *See Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 652, 660 (9th Cir. 2011).

#### a.      *Assist in the Performance*

HHS's definition of "assist in the performance" stretches the term to include activities only tangentially related to any healthcare procedure. Only the Church Amendments refer to "assist[ing] in the performance" of an activity, 42 U.S.C. § 300a-7(c)(1), (d), and nothing in that statutory scheme envisions the broad definition in the Rule.

Specifically, Congress provided that a healthcare professional is not required to "perform" or "assist in the performance" of "any sterilization procedure or abortion." 42 U.S.C. § 300a-7(c)(1); *see* 42 U.S.C. § 300a-7(d) (same for individuals who "assist in the performance of" an HHS-funded "health service program or research activity"). "Performance" means "the execution of an action," and to "assist" means "to give support or aid," such as when "another surgeon

[assisted] on the operation." *Merriam-Webster's Collegiate Dictionary* 70, 863 (10th ed. 1996). By using the terms "perform" and "assist in the performance," Congress required that the person objecting must have a close and direct nexus to the objected-to activity. The sponsor of the Church Amendments warned against reading the statute more expansively: "There is no intention here to permit a frivolous objection from someone unconnected with the procedure to be the basis for a refusal to perform what would otherwise be a legal operation." 119 Cong. Rec. S9377, S9597 (Mar. 27, 1973).

But that is what HHS did. It defined the terms expansively, and it expressly admitted that it was doing so. *See* 84 Fed. Reg. at 23,186-23,187. Under HHS's definition, "assist in the performance" reaches any action with "a specific, reasonable, and articulable connection to furthering" the objected-to procedure, including "counseling, referral, training, or otherwise making arrangements for" a procedure. *Id* at 23,263, § 88.2. And then HHS expands the Rule's reach even further by separately defining "referral" to include the provision of virtually any information that may lead to a patient obtaining an objected-to procedure. *Id* at 23,264, § 88.2 The result is to invite objections by workers whose activities are remote from the actual performance of procedures or medical procedures—such as a receptionist who greets patients or makes appointments, a clerical worker who explains insurance coverage or submits claims, or a security guard who directs patients to particular areas of the hospital. Indeed, HHS was willing to exclude only "irrational assertions" where "there is no actual connection by which the action specifically furthers the procedure." *Id.* at 84,187.

HHS's definition of "assist in the performance" goes beyond Congress's intended meaning of the phrase. And HHS's inclusion of "counseling" and "referral" in the definition of "assist in the performance" makes that clear. In the underlying statutes, Congress did not include "counseling" and "referral" in "assist[ing] in the performance" of an activity. Instead, Congress separately referred to "counseling" and "referral" as different activities that were independently protected under the statutes. 42 U.S.C. § 300a-7(e) ("counsel"); Pub. L. 115-245, § 507(d)(2), 132 Stat. 2981, 3118 (2018) ("refer"); 42 U.S.C. § 238n(a)(1), (a)(2) ("referrals"). That separate treatment is a strong indication that "counseling" and "referral" mean something different from "assist in the

performance."

### b.    Discriminate or Discrimination

HHS broadened the Rule's reach even further through its expansive definition of "discrimination." The Weldon Amendment, Coats-Snowe Amendment, and Church Amendments prohibit "discrimination" against certain objectors in certain contexts. *See* Pub. L. 115-245, § 507(d)(2), 132 Stat. 2981, 3118 (2018); 42 U.S.C. § 238n(a)(1), (a)(2); *id.* § 300a-7(c)(1)-(2), (e). As commonly understood, "discrimination" is "a failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored." *Black's Law Dictionary* (11th ed. 2019). This understanding is well established: The ACA, for example, prohibits "discrimination" in healthcare on the basis of race, color, national origin, age, sex, or disability. 42 U.S.C. § 18116.

The Rule goes far beyond what Congress intended by placing unprecedented limits on accommodation policies and preventing healthcare providers from ensuring patient health and safety. Under the Rule, "[d]iscrimination" means any change to the objecting employee's "position," "status," "benefit[s]," or "privilege[s]" in employment, as well as use of any "policies[] or procedures" that subject the objector to "any adverse treatment." 84 Fed. Reg. at 23,263, § 88.2. The Rule encompasses almost any negative action towards religious objectors without considering whether that action is legally justifiable. That is true even though federal law recognizes a number of rationales and defenses to justify those actions, including that an employer need not provide an accommodation for an employee's religious beliefs when the accommodation would cause undue hardship to the employer. *See* 42 U.S.C. § 2000e(j); *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2032 (2015); *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 607 (9th Cir. 2004).

Under the Rule, a healthcare entity could be deemed to have engaged in unlawful discrimination simply by taking measures that are reasonably necessary to find out about religious objections and ensure that those objections do not compromise patient care. Only actions falling within the definition's narrow and restrictive exceptions are excluded. *See* pp. 7-8, *supra.* Thus, under the Rule's broad definition of "assist in the performance," a worker might object to providing certain information to patients, and might even object to directing patients to someone else who

1  could help them, and under the Rule's broad definition of "discrimination," the entity employing

2  that worker would be unable to reassign the worker, thereby putting patients at risk.

3      Congress plainly did not intend its prohibition on "discrimination" to require healthcare

4  entities to put the needs of religious objectors above the needs of all others. And Congress

5  recognized, in the ACA and EMTALA, that providers have obligations to provide healthcare and

6  information, especially in emergency circumstances. To meet those obligations, providers must be

7  able to adopt policies that ensure that patients will receive care even when an employee raises a

8  religious objection. Yet, in its definition of "discrimination," HHS declined to consider the

9  legitimate needs of healthcare providers. And by elevating religious objections over the needs of

10  patients, HHS enables new and unjustified forms of discrimination—turning Congress's mandate

11  not to "discriminate" on its head.

12  **B.    Plaintiffs Are Likely to Succeed On Their Establishment Clause Claim**

13      The Establishment Clause provides essential protections for religious freedom. It bars

14  official conduct that favors one faith over others, has the primary purpose or primary effect of

15  advancing or endorsing religion, or coerces religious belief or practice. *See, e.g.*, *McCreary Cnty.*

16  *v. ACLU of Ky.*, 545 U.S. 844, 860 (2005); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 302

17  (2000); *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1054 (9th Cir. 2007).

18      The Denial-of-Care Rule violates those constitutional guarantees. It officially prefers the

19  religious beliefs of objectors over the rights and beliefs of providers and patients, and it coerces

20  religious exercise by requiring providers and patients to act in accordance with objecting

21  employees' religious beliefs. The Rule's favoritism toward religious beliefs invoked by objecting

22  employees is subject to strict scrutiny. *See Larson v. Valente*, 456 U.S. 228, 246 (1982). The Rule

23  cannot survive strict scrutiny because, among other reasons, there are obvious less-restrictive

24  alternatives for accommodating objecting employees, including providers' existing policies.

25  **1.    The Rule Impermissibly Imposes the Costs and Burdens of Objecting**
26  **Employees' Religious Beliefs on Patients and Other Third Parties**

27      The Establishment Clause flatly prohibits religious exemptions or accommodations by

28  government that would have a "detrimental effect on any third party." *Burwell v. Hobby Lobby*

23

*Stores, Inc.*, 134 S. Ct. 2751, 2781 n.37 (2014); *see Cutter v. Wilkerson*, 544 U.S. 709, 720 (2005). That is because religious exemptions that burden third parties impermissibly prefer the religion of those who are benefited over the beliefs and interests of those who are not. *See, e.g.*, *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 15 (1989) (plurality opinion). The Denial-of-Care Rule violates the Establishment Clause because it imposes costs, burdens, and harms on healthcare providers and patients for the purpose of facilitating the religious beliefs and practices of objecting employees.

The prohibition against harming third parties is longstanding and well settled. In *Sherbert v. Verner*, 374 U.S. 398 (1963), for example, the Supreme Court permitted a religious accommodation under a state unemployment-benefits law for an employee who was fired for refusing to work on her Sabbath because the requested accommodation would not "abridge any other person's religious liberties." *Id.* at 409. In *Estate of Thornton v. Caldor*, 472 U.S. 703 (1985), by contrast, the Court invalidated a state law requiring employers to accommodate people observing the Sabbath in all instances because "the statute t[ook] no account of the convenience or interests of the employer or those of other employees who do not observe a Sabbath." *Id.* at 709; *see Texas Monthly*, 489 U.S. at 15, 18 n.8 (plurality opinion) (invalidating tax exemption for religious periodicals because it increased taxes on nonbeneficiaries). Accordingly, in evaluating Establishment Clause challenges, courts must "account [for] the burdens a requested accommodation may impose on nonbeneficiaries" and ensure that the accommodation does not "override other significant interests." *Cutter*, 544 U.S. at 720, 722.

Plaintiffs and other healthcare providers have developed policies and procedures to ensure that they can deliver care to their patients efficiently and fairly while respecting employees' religious beliefs. The Rule undermines essential patient protections by inviting employees, contractors, and volunteers of a healthcare institution to deny care to patients based on religious objections either to the treatment or to the characteristics or circumstances of the patient, without regard to the burdens and harms they will impose on patients and providers. *See* Burkhart Decl. ¶¶ 13-16; Lorenz Decl. ¶¶ 20-23; Vargas Decl. ¶ 13; Sproul Decl. ¶¶ 11-12.

For example, the County of Santa Clara's hospitals allow their employees to opt out of participating in certain procedures when they have religious objections, so long as they provide

notice adequate to allow the hospital to arrange appropriate alternative staffing. *See* Lorenz Decl. ¶¶ 11-13; Tullys Decl. ¶ 11; Sproul Decl. ¶¶ 8-9. But the Rule limits the hospitals' ability to require advance notice of objections, because hospitals can ask about objections only "after . . . hiring" and "once per calendar year" thereafter. 84 Fed. Reg. at 23,263. The Rule also limits the hospitals' ability to make staffing adjustments by permitting only *voluntary* accommodations for objecting employees. *Id.* at 23,263. Thus, the County could not reassign an employee who objects to performing core functions of his or her job but refuses to accept a transfer. The County's policies also require all staff members to assist in emergencies, Sproul Decl. ¶¶ 8, 10; Lorenz Decl. ¶¶ 18-19, but the Rule contains no exceptions for emergencies, 84 Fed. Reg. at 23,176.

If the County retains its existing policies to ensure continuity of patient care, it could be deprived of all Medicare and Medicaid reimbursements and other federal funding, thus compromising its ability to serve the neediest patients. If the County attempts to comply with the Rule while still ensuring patient care, it could be forced to use double-staffing and other prohibitively expensive measures. Lorenz Decl. ¶¶ 18-19. Either way, the Rule will severely burden the County and its patients. *Id.* ¶¶ 11-13, 22-24.

Further, the Rule threatens the very existence of many healthcare facilities whose institutional mission, core functions, or small size do not allow them to operate if an employee denies assistance to patients, refuses to assist in a referral, or refuses reassignment to another job. Lorenz Decl. ¶¶ 15-16; Burkhart Decl. ¶¶ 22-24; Vargas Decl. ¶ 10; Shafi Decl. ¶ 8. That is particularly true for entities that provide abortion and other reproductive-health services or transition-related care or other services to LGBT patients. Lorenz Decl. ¶¶ 15-16; Burkhart Decl. ¶¶ 22-24; Vargas Decl. ¶ 10; Shafi Decl. ¶ 8. In short, although the Establishment Clause flatly prohibits the government from mandating that "religious concerns automatically control over all secular interests," *Caldor*, 472 U.S. at 709, that is what the Denial-of-Care Rule does.

### 2.    The Rule Impermissibly Coerces Patients and Healthcare Providers to Adhere to the Government's Favored Religious Practices

"[T]he Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise." *Lee v. Weisman*, 505 U.S. 577, 587 (1992); *see Santa Fe*,

530 U.S. at 312. "For the government to coerce someone to participate in religious activities strikes at the core of the Establishment Clause." *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007). But the Denial-of-Care Rule does just that: It uses the government's authority to coerce Plaintiffs and their patients to act in accordance with the religious beliefs and practices of objecting employees.

The Rule emboldens individual employees to dictate whether and how patients receive healthcare based on their own personal religious views. That is true even when those beliefs are expressly contrary to the religious or other mission of a healthcare institution or the patient's own beliefs. Women who seek reproductive healthcare at a clinic that provides family-planning services may have that care denied based on the religious views of a single employee. Barnes Decl. ¶¶ 29-30. LGBT patients may be pressured to conform to religious views on gender expression and sexual orientation that an objecting employee holds, lest they be denied care. *See* Tullys Decl. ¶ 13; Pumphrey Decl. ¶¶ 6-7; Cummings Decl. ¶ 14. And the Rule invites individual employees to refuse to provide patients with complete medical information and instead to give skewed advice based on their own religious beliefs rather than medical protocols. Henn Decl. ¶ 6.

### C.  Plaintiffs Are Likely to Succeed on Their Equal Protection Claim

By targeting transgender patients' transition-related healthcare needs for religious and moral objection, the Rule discriminates based on sex, gender identity, and transgender status. It therefore is subject to strict scrutiny (for discrimination based on transgender status), or at least heightened scrutiny (for discrimination based on sex). The Rule fails any level of review, because it is not even rationally related to any legitimate governmental interest, let alone adequately tailored to further an exceedingly persuasive or compelling one.

Discrimination against transgender people is discrimination based on sex for several reasons. *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015) (denial of treatment for gender dysphoria constitutes sex discrimination). First, a person's gender identity is a sex-related characteristic. *Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 527 (D. Conn. 2016). Second, discriminating based on a person's gender transition is discrimination based on sex, just as firing an employee because she converts from Christianity to Judaism "would be a clear case of discrimination 'because of religion.'" *Schroer v. Billington*, 577 F. Supp. 2d 293, 306 (D.D.C.

2008). Third, discrimination against transgender people is rooted in sex stereotypes, because a transgender person's "inward identity [does] not meet social definitions of masculinity [or femininity]" associated with one's assigned sex at birth. *Schwenk v. Hartford*, 204 F.3d 1187, 1201 (9th Cir. 2000); *see Whitaker v. Kenosha Unified Sch. Dist.*, 858 F.3d 1034, 1051 (7th Cir. 2017); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 285-86 (W.D. Pa. 2017).

Separately, discrimination based on transgender status is a suspect classification. *See Norsworthy*, 87 F. Supp. 3d at 1119. Indeed, strict scrutiny is warranted when the government targets a class that (1) has been "historically subjected to discrimination," (2) has a defining characteristic bearing no "relation to ability to perform or contribute to society," (3) has "obvious, immutable, or distinguishing characteristics," and (4) is "a minority or politically powerless." *Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012), *aff'd on other grounds*, 570 U.S. 744 (2013) (internal quotation marks omitted). Although the first two considerations alone can be dispositive, *see Golinski v. U.S. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 983 (N.D. Cal. 2012), all of them are present in the government's discrimination based on transgender status and so strict scrutiny applies, *see, e.g.*, *Karnoski v. Trump*, 2018 WL 1784464 *9-*10 (W.D. Wash. Apr. 13, 2018); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1144 (D. Idaho. 2018).

Under heightened scrutiny, a challenged classification is presumptively unconstitutional, and the government bears the burden of demonstrating that the classification bears a substantial relationship to important government interests. *U.S. v. Virginia*, 518 U.S. 515, 533 (1996) ("VMI"). Under strict scrutiny, the government action must be narrowly tailored to serve compelling interests. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Under either standard, the government must account for the harms it causes, including the dignitary harm that results from imposition of a second-class status. *SmithKline Beecham v. Abbott Labs.*, 740 F.3d 471, 482 (9th Cir. 2014).

The Rule is not even rationally related to HHS's asserted interests in "removing unlawful barriers to careers in the health field" and "ensuring the implementation and enforcement of existing laws." 83 Fed. Reg. at 3916. On the contrary, the Rule arbitrarily elevates religious objections over the health and well-being of patients, contrary to federal law and the operational needs of healthcare

providers. Giving a preference for certain religious beliefs (particularly about reproductive care and gender dysphoria) over the needs of patients is not a legitimate government purpose. *McCreary Cnty.*, 545 U.S. at 859-60.

Although the Rule speculates about the possibility that an increased number of healthcare providers will enter the field if they are permitted to deny certain types of care, 84 Fed. Reg. at 23,247, 23,250, HHS admits that it lacks data to support (and the record does not support) that assertion. *See VMI*, 518 U.S. at 533 (hypothesized justifications inadequate under heightened scrutiny). And even if those additional providers entered the field, it would not solve the problem of discriminatory denials of care, because the new providers would be those who want to deny reproductive or transition-related care. HHS acknowledges that some patients (such as LGBT patients and those seeking reproductive care) will be disadvantaged, but concludes that the hypothetical benefits of the Rule to other people justify the Rule. 84 Fed. Reg. at 23,251-23,252. That is a government decision to benefit certain patients at the expense of others, and it is impermissible. *Romer v. Evans*, 517 U.S. 620, 633 (1996) (a preference for one group of people over another is a "denial of equal protection in the most literal sense"). The government may not give effect to "private bias." *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984). When "sincere, personal opposition becomes enacted law and public policy, the necessary consequence is to put the imprimatur of the [government] itself on an exclusion that soon demeans or stigmatizes those whose own liberty is then denied." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2602 (2015).

The Rule's wide-ranging, harmful effects easily could be avoided with a rule that respects religious objections while ensuring patient health, consistent with the existing policies of Plaintiffs and other healthcare organizations. The Rule's illegitimate purpose and poor tailoring, and the existence of obvious less restrictive alternatives, doom the Rule under the Equal Protection Clause.

### D.    Plaintiffs Are Likely to Succeed On Their Due Process Claim

The Fifth Amendment's Due Process Clause protects the right to make intimate decisions concerning procreation, family life, marriage, bodily integrity, and self-definition because such decisions are core to each person's identity, central to an individual's dignity and autonomy, and "shape an individual's destiny." *Obergefell*, 135 S. Ct. at 2593, 2597, 2599; *see Planned*

28

*Parenthood v. Casey*, 505 U.S. 833 (1992); *Lawrence v. Texas*, 539 U.S. 558, 574 (2003). The Rule violates this guarantee by unduly burdening patients' access to abortion; impermissibly interfering with their access to contraception; and impermissibly interfering with transgender and gender non-conforming patients' medical autonomy, bodily integrity, and ability to live in accordance with their gender identity.

### 1.    Abortion

The Supreme Court has repeatedly affirmed a woman's right to "retain the ultimate control over her destiny and her body." *Casey*, 505 U.S. at 869. The government "may not prohibit any woman from making the ultimate decision to terminate her pregnancy" before viability. *Gonzales v. Carhart*, 550 U.S. 124, 146 (2007) (quoting *Casey*, 505 U.S. at 879). It also may not impose an undue burden on the right to abortion. *Id*. Thus, a law is unconstitutional if its "purpose or effect" is to "'*place a substantial obstacle* in the path of a woman seeking an abortion before the fetus attains viability.'" *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2299 (2016) (quoting *Casey*, 505 U.S. at 878). When analyzing restrictions on access to abortion, the Court has made clear that where a law's burdens exceed its benefits, those burdens are by definition undue, and the obstacles they embody are by definition substantial. *Id*. at 2300, 2309-10, 2312, 2318. The undue burden standard does not permit restrictions that hinder access to abortion. *Casey*, 505 U.S. at 877.

The Rule violates these principles. First, it empowers a broad class of healthcare employees to impede a pregnant person's exercise of the right to abortion prior to viability. *Casey*, 505 U.S. at 894-96. The Constitution prohibits unjustified state interference with abortion, even when the government invokes the rights of others to attempt to justify that interference. *Id.* at 894-96 (invalidating spousal-notification provision that would enable a husband to prevent his wife from obtaining an abortion; husband's interest did not permit the State to empower him with such "troubling degree of authority over his wife"). Rather than informing a woman's choice, the Rule coerces that choice by empowering third parties, including those with only a tangential connection to the procedure, to delay and even ultimately control a woman's decision. Permitting their views to override those of a pregnant person "hinder[s]" access to abortion in precisely the manner foreclosed by the Supreme Court. *Id*. at 877, 894-96.

Further, the Rule will deter pregnant persons from seeking abortion care, based on stigma, fear of judgment, fear of discrimination, and fear of receiving compromised care. *See* McNicholas Decl. ¶¶ 27-28. Stigma around abortion fosters fear and psychological stress in women seeking care. *See id.* ¶ 28; Barnes Decl. ¶ 30. And empowering a third party to effectively veto a pregnant person's abortion violates their right to make "choices central to personal dignity and autonomy." *Lawrence*, 539 U.S. at 574; *see also Obergefell*, 135 S. Ct. at 2602; *Casey*, 505 U.S. at 851. These deterrents will prevent pregnant people from seeking abortion "as surely as if the [government] had outlawed abortion in all cases." *Casey*, 505 U.S at 894.

Finally, the Denial-of-Care Rule will artificially limit the number of abortion providers across the United States. There already is a national shortage of abortion providers due to hospital mergers and laws restricting access to abortion in states throughout the country. McNicholas Decl. ¶ 19. The significant reduction in providers that likely will result from the Rule will delay and prevent women's access to care, compounding the logistical and financial burdens patients face and increasing their risk of injury and death. *Id.* ¶¶ 26-30.

Whether the Rule forces providers to self-regulate by altering their policies to permit the denial of care to patients, to cease providing abortion services altogether, or to face the loss of all federal funding, it coerces the decision to have an abortion and places an undue burden on the right to abortion in violation of the Due Process Clause.

### 2.    Contraception

The Constitution also protects an individual's right to reproductive autonomy, including the use of contraception. The Supreme Court first recognized a constitutional right to make certain personal, intimate choices about whether and when to have children over fifty years ago. *Griswold v. Connecticut*, 381 U.S. 479 (1965). Since then, the Court has repeatedly reaffirmed that "the Constitution protects individual decisions in matters of childbearing from unjustified intrusion by the State." *Carey v. Population Servs. Int'l*, 431 U.S. 678, 687 (1977); *see Casey*, 505 U.S. at 852-53; *Eisenstadt*, 405 U.S. at 453.

Strict scrutiny applies to government actions that limit access to contraception. Access to contraception is a core aspect of bodily integrity, personal decision-making, and marital, familial,

and sexual privacy. *Casey*, 505 U.S. at 856. And the Supreme Court has not hesitated to strike down unjustified restrictions on access to contraception. For example, the Court invalidated a state statute that did not ban contraception directly but limited distribution of contraceptives to licensed pharmacists, explaining that it "clearly impose[d] a significant burden on the right of the individuals to use contraceptives" by decreasing access, price competition, and privacy in selection and purchase. *Carey*, 431 U.S. at 689. The Court recognized that the right to make decisions about contraception is fundamental, applied strict scrutiny, and concluded that the statute served no compelling state interest and bore no relation to the State's interest in protecting health. *Id.* at 685, 690-91.

The Denial-of-Care Rule fails strict scrutiny. The Rule lacks even a rational relationship to a legitimate government interest, let alone the required narrow tailoring to serve a compelling government interest. As explained (pp. 9-12, 14-16, *supra*), the Rule does not serve HHS's asserted purposes of encouraging health care providers to enter the field or implementing and enforcing existing laws, and it will cause numerous countervailing harms. The Rule will reduce access to contraception and remove from women and LGBT patients the most effective means by which to prevent unintended pregnancy, coercing them into unwanted pregnancies, imposing numerous health risks, and severely diminishing the fundamental right to reproductive decision-making. McNicholas Decl. ¶ 24; Phelps Decl. ¶ 34. This interferes with their ability to participate fully in the "marketplace and the world of ideas," *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 726 n.11 (1982), and drastically compromises their ability to make "choices central to personal dignity and autonomy," *Lawrence*, 539 U.S. at 574; *see Casey*, 431 U.S. at 690-91.

### 3.     Gender-Affirming Care

The Denial-of-Care Rule invites healthcare providers to deprive transgender and gender non-conforming patients of medically necessary and often life-saving care, including treatment for gender dysphoria, thereby impermissibly burdening their medical autonomy, bodily integrity, dignity, and ability to live in accord with their gender identity. Gender is fundamental to a person's identity; it is the internalized, inherent sense of who a person is (*e.g.*, male, female, or non-binary). Ettner Decl. ¶ 14; Valle Decl. ¶ 13. This is as true for a transgender person as for a non-transgender

31

1    person. Ettner Decl. ¶ 14. A person's gender identity is so fundamental that they cannot be required

2    to abandon it. *Id.* ¶ 15; *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000), *overruled*

3    *on other grounds by Thomas v. Gonzales*, 409 F.3d 1177, 1187 (9th Cir. 2005).

4            Each person has a fundamental right to live and express oneself in a manner consistent with

5    their gender identity, because doing so is a core aspect of individual self-definition, dignity, and

6    autonomy. *See Lawrence*, 539 U.S. at 562 ("Liberty presumes an autonomy of self that includes

7    freedom of thought, belief, expression, and certain intimate conduct."). The substantive protections

8    of the Due Process Clause protect the right of all people to possess and control their own person,

9    and to "define and express their identity." *Obergefell*, 135 S. Ct. at 2593. This includes the right to

10   live in accord with one's gender identity. *Karnoski*, 2017 WL 6311305, at *8 (plaintiffs likely to

11   succeed in demonstrating that ban on transgender military service violates fundamental right of

12   service members to live and express themselves in accordance with their gender identities)

13   (injunction stayed by Supreme Court pending appeal); *Arroyo Gonzalez v. Rossello Nevares*, 305

14   F. Supp. 3d 327, 334 (D.P.R. 2018) (policy depriving transgender people of accurate identity

15   documents infringed due process right to self-determination). And it includes the right to make

16   medical decisions for oneself and to medical autonomy. *Coons v. Lew*, 762 F.3d 891, 899 (9th Cir.

17   2014).

18           The Rule infringes this protected autonomy and self-determination by inviting healthcare

19   workers and entities to deny transgender patients access to medically necessary healthcare. For

20   transgender and gender-nonconforming patients, the "only real path," *Obergefell*, 135 S. Ct. at

21   2594, to the full recognition and expression of their true selves, and to be able to participate in

22   public life with dignity, consists of the ability to access gender-affirming medical care, including

23   surgical procedures, hormone therapy, and other medically necessary care. The ability to live in

24   accord with and express one's gender identity is "so fundamentally important . . . that the

25   government may not, absent satisfying a heightened level of scrutiny, infringe or burden an

26   individual's autonomy or freedom to make [such a] decision." Scott Skinner-Thompson, *Outing*

27   *Privacy*, 110 Nw. U. L. Rev. 159, 171-72 (2015). The Rule severely burdens transgender and

28   gender-nonconforming patients, while not rationally serving even any legitimate governmental

1   interest, let alone the compelling one required. It therefore violates due process.

2   **E.    Plaintiffs Are Likely to Succeed On Their Free Speech Claim**

3   The Denial-of-Care Rule impermissibly chills LGBT patients who seek medical care from

4   being open about their gender identity or transgender status and from expressing themselves in a

5   manner consistent with their gender identities. Courts long have held that disclosing one's gender

6   identity or sexual orientation—sometimes referred to as "coming out"—is protected First

7   Amendment expression. *See Karnoski*, 2017 WL 6311305, at *9 (disclosure of gender identity and

8   transgender status protected); *Log Cabin Republicans v. United States*, 716 F. Supp. 2d 884, 926

9   (C.D. Cal. 2010) (military's "Don't Ask, Don't Tell" policy was a content-based speech restriction

10   because "[h]eterosexual members are free to state their sexual orientation . . . while gay and lesbian

11   members of the military are not"), *vacated as moot*, 658 F.3d 1162 (9th Cir. 2011); *see Gay Students*

12   *Org. of Univ. of N.H. v. Bonner*, 509 F.2d 652, 659-61 (1st Cir. 1974); *Henkle v. Gregory*, 150 F.

13   Supp. 2d 1067, 1075-77 (D. Nev. 2001); *Weaver v. Nebo Sch. Dist.*, 29 F. Supp. 2d 1279, 1284-85

14   (D. Utah 1998); *Fricke v. Lynch*, 491 F. Supp. 381, 385 (D.R.I. 1980). An individual's definition

15   and expression of their gender identity through their appearance also is protected expression. *See*

16   *Doe ex rel. Doe v. Yunits*, 2000 WL 33162199, at *3 (Mass. Super. Oct. 11, 2000), *aff'd sub nom*,

17   *Doe v. Brockton Sch. Comm.*, 2000 WL 33342399 (Mass. App. Ct. Nov. 30, 2000).

18   The Rule impermissibly burdens this protected speech and expression. A regulation "may

19   burden speech" even if it "stops short of prohibiting it." *Doe v. Harris*, 772 F.3d 563, 572 (9th Cir.

20   2014). Here, the Rule will have the "inevitable effect of burdening," *id.* at 574, LGBT patients'

21   disclosure of their transgender status or their gender-nonconforming expression because they will

22   fear denial of healthcare if they do make such disclosure, *see Mendocino Envtl. Ctr. v. Mendocino*

23   *Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (government action violates First Amendment if it

24   would cause a person of "ordinary firmness" to self-censor). It does not matter that this chilling

25   depends both on governmental and non-governmental actors (the objecting employees), because

26   the government "may not induce, encourage or promote private persons to accomplish what it is

27   constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 463, 465 (1973).

28   The Rule also denies the benefit of federal healthcare funds to transgender and gender

33

nonconforming people based on their protected expression. Doing so also penalizes and inhibits the exercise of that fundamental freedom. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 794 (1988); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). And the Rule is overbroad because it impermissibly chills and burdens the exercise of a substantial amount of patients' constitutionally protected speech and expression, beyond any legitimate sweep of the underlying statutes. *See United States v. Sineneng-Smith*, 910 F.3d 461, 470 (9th Cir. 2018).

The Rule burdens speech based on its content and viewpoint, because it attaches different consequences to the same speech depending on the identity of the speaker. *See Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). For example, the Rule facilitates denial of treatment to a transgender woman who discloses her gender identity or checks the box marked "female" at her endocrinologist's office, but not to a non-transgender woman who discloses that she identifies as cisgender and female. The government may not burden speech "because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992) (citations omitted). Content-based regulation is subject to "the most exacting scrutiny," *Texas v. Johnson*, 491 U.S. 397, 412 (1989) (citation omitted), and "[v]iewpoint discrimination is . . . an egregious form of content discrimination," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

The Rule cannot satisfy that rigorous First Amendment scrutiny because it lacks sufficient justification for the many harms it will cause. The Rule will harm patients by coercing them to stay in the closet, to self-censor about their medical histories and needs, and to refrain from engaging in gendered expression. Shanker Decl. ¶¶ 11-12; Vargas Decl. ¶ 14; Henn Decl. ¶ 5; Bolan Decl. ¶¶ 8-10; Carpenter Decl. ¶ 11; Manley Decl. ¶ 8; Harker Decl. ¶ 14. Remaining closeted from a healthcare provider can result in significant adverse health consequences, not just to an individual patient, but to public health. *See* Bolan Decl. ¶¶ 10-11 (patient who conceals same-sex sexual history may not be screened for HIV or other infections or cancers, or prescribed medications effective at preventing HIV transmission; transgender patients who do not disclose their transgender status may not be given necessary tests and screenings, such as for testicular or prostate cancer for transgender women); Carpenter Decl. ¶ 5 (patient who did not disclose same-sex sexual

history to provider was not given appropriate testing and passed his infection to five other people before appropriate diagnosis).

Many LGBT patients already fear healthcare providers because of past experiences of anti-LGBT bias after disclosing their sexual orientation or gender identity, and a significant number are not "out" to one or more of their healthcare providers. Shanker Decl. ¶¶ 10-11; Henn Decl. ¶ 3; *see* Ettner Decl. ¶ 55. The Rule will erode trust further between patients and providers, resulting in worse patient outcomes. Carpenter Decl. ¶¶ 8-9; Henn Decl. ¶ 5; *see Conant v. Walters*, 309 F.3d 629, 636-37 (9th Cir. 2002) (recognizing, in a First Amendment challenge, that "barriers to full disclosure would impair diagnosis and treatment"). There is no justification for those harms, and there is a readily available, workable alternative—the policies put in place under the narrow statutes that Congress enacted to protect religious objectors. Because the Rule goes well beyond those statutes, burdening constitutionally protected speech for no good reason, it violates the First Amendment.

### F. The County Is Likely to Succeed on Its Separation-of-Powers and Spending Clause Claims

In promulgating the Rule, HHS has usurped congressional authority to impose conditions on federal spending and imposed conditions that transgress the bounds of even Congress' spending power.[4]

Since the Nation's founding, the power of the purse has been allocated to Congress, the branch of the federal government more directly answerable to the people. *See* U.S. Const. art. I, § 8, cl. 1; *see City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). Congress may give Executive Branch agencies some discretion in deciding how to use appropriated funds, but that discretion necessarily is cabined by the scope of the delegation. *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 297-98 (2013). Further, agencies may not use appropriated funds in a way that effectively alters the terms of the anchoring statutes, which Congress has "finely wrought and exhaustively considered" via the legislative process. *Clinton v. City of New York*, 524 U.S. 417,

---

[4] The County joins in the Spending Clause and separation-of-powers arguments advanced in the motions for preliminary injunctive relief submitted by the State of California and City and County of San Francisco. *See State of California v. Azar*, No. 4:19-cv-02769-HSG (N.D. Cal.), Doc. No. 11; *City and County of San Francisco v. Azar*, No. 4:19-cv-2405-JCS (N.D. Cal.), Doc. No. 14.

439-40 (1998). As explained (pp. 20-23, *supra*), the Rule radically departs from federal religious-objector statutes, falling well outside the authority Congress has delegated.

Indeed, the Rule is so coercive and unfair that even Congress would lack authority to impose the same conditions by statute. The Rule places States and localities like the County at risk of potentially ruinous sanctions, based on unanticipated, after-the-fact, and confusing requirements. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581-84 (2012) (conditioning continued receipt of Medicaid funding on after-the-fact conditions exceeded Congress's Spending Clause powers); *Pennhurst State School and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (if Congress wishes to condition the States' receipt of federal funds it "must do so unambiguously"). And it threatens funding of critical local functions—including those supporting many of the County's most vulnerable populations, protecting the health and safety of children and individuals with disabilities, and ensuring disaster preparedness—to advance concerns unrelated to the federal interest in the particular programs being funded. *See Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 580; *see also South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987).

HHS lacks authority to so forcibly unravel local public policy choices. The County is responsible under California law for providing medical care for indigent patients, preventing the transmission of communicable disease, and protecting the health and safety of its residents. Cal. Const. art. XI, § 7; Cal. Welf. & Inst. Code § 17000 *et seq.*; Cal. Health & Saf. Code §§ 10100 and 120100 *et seq.* Its hospitals, pharmacies, clinics, and public health department rely on roughly a billion dollars in federal funding for their continued existence and operation. Lorenz Decl. ¶ 22. In mandating that the County allow its staff to turn patients away based on religious objections to the care sought, to refuse to help during an emergency based on such objections, or otherwise to stigmatize and harm patients, the Rule is fundamentally inconsistent with the County's own policy choices and flatly interferes with its exercise of local, public-health functions. It was precisely to protect such policy choices about matters of local concern that the Framers reserved to the States and their political subdivisions all powers not expressly enumerated in the Constitution. *See United States v. Morrison*, 529 U.S. 598, 617-19 (2000); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985).

## II.   IF PERMITTED TO TAKE EFFECT, THE RULE WILL IRREPARABLY HARM PLAINTIFFS, THEIR MEMBERS, AND THEIR PATIENTS

Because of the Rule, Plaintiffs' patients will almost certainly experience delays in obtaining medical care or be denied care altogether, leading them to incur increased costs and suffer worse health outcomes. The Rule will compromise Plaintiffs' ability to fulfill their core functions and ensure adequate patient care, and will require them to incur unrecoverable administrative costs to attempt to comply with the Rule. The Rule also will violate the constitutional rights of Plaintiffs and their patients. This Court should issue a preliminary injunction to prevent these irreparable harms while it considers Plaintiffs' challenge to the Rule.

### A.   The Rule Will Severely Harm Plaintiffs' Patients

As a result of the Rule, Plaintiffs' patients will encounter new obstacles to obtaining medical care. They will face increased risks that they will be denied care or information because a healthcare worker whom they encounter objects to certain procedures. They will find it more difficult to obtain certain services because the Rule will deter healthcare facilities from offering those services. And some of them will not be able to obtain medically necessary healthcare.

The delay or denial of healthcare, particularly in emergency situations, is likely to cause patients pain, complications, injury, or even death—all irreparable harms. *See Harris v. Bd. of Supervisors, Los Angeles Cnty.*, 366 F.3d 754, 762 (9th Cir. 2004). Patients seeking contraceptive care may suffer substantial consequences such as an unintended pregnancy if their care is delayed. McNicholas Decl. ¶ 41; *see Pennsylvania v. Trump*, 351 F. Supp. 3d 791, 828 (E.D. Pa. 2019). And patients who are not informed of all information and options regarding their care will have their rights to informed consent stripped away. Nguyen Decl. ¶ 9; McNicholas Decl. ¶ 18.

Patients denied care will also face irreparable dignitary and emotional harms. That is particularly true for transgender patients denied transition-related care because an employee objects to their very identity, and for reproductive healthcare patients denied the ability to make choices central to defining their life's course. Lorenz Decl. ¶ 16; Sproul Decl. ¶ 13; Burkhart Decl. ¶ 22; McNicholas Decl. ¶ 43; Pumphrey Decl. ¶ 8; Ettner Decl. ¶¶ 48, 56; *see Whitaker*, 858 F.3d at 1045 (describing harm to transgender boy as a result of being denied access to school's restroom for boys). Patients who anticipate that they may be refused care under the Rule will be deterred from

37

seeking care or providing information important to their care, fearing hostility and stigma. Lorenz Decl. ¶ 15; McNicholas Decl. ¶¶ 8, 23, 28-29, 44-47; Bolan Decl. ¶ 8; Ettner Decl. ¶ 55. That stigma—"imposition of a second-class status"—is "itself a harm of great constitutional significance." *SmithKline Beecham*, 740 F.3d at 482. "Ultimately, the consequence of the reduced availability and quality of health services is worse health outcomes for patients and the public as a whole." *California v. Azar*, 2019 WL 1877392, at *10 (N.D. Cal. Apr. 26, 2019).

The regime that HHS seeks to create, which elevates religious objections over all other concerns, also violates the constitutional rights of Plaintiffs and their patients. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). When a plaintiff raises even a "colorable claim" of a First Amendment violation, that itself is sufficient to establish irreparable injury. *Warsoldier v. Woodford*, 418 F.3d 989, 1002 (9th Cir. 2005). The Rule's many immediate harms provide good reason to enjoin its enforcement.

### B.   The Rule Will Require Plaintiff Healthcare Providers to Incur Substantial, Unrecoverable Costs

Certain Plaintiffs, including the County, have adopted policies and practices that accommodate and respect religious objections while ensuring patient care and operational stability. *See* Lorenz Decl. ¶ 11. If the Rule goes into effect, those Plaintiffs will immediately incur significant costs to review their policies and practices and create new ones in an effort to comply with the Rule. *See* Lorenz Decl. ¶ 20; Burkhart Decl. ¶¶ 13, 18, 27. These costs are not recoverable, and they constitute irreparable harm. *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (noting that the APA makes no allowance for monetary damages, and thus economic harms are irreparable in APA challenges).

Because the Rule expands the categories of employees who may invoke objections, the costs and administrative burdens associated with managing employees' religious and moral objections will increase substantially. Under the County's current policies, religious objectors must make their managers aware of their objections in advance to permit staffing arrangements that avoid compromising patient care. Lorenz Decl. ¶ 11, Ex. A; *see* Tullys Decl. ¶ 9 (describing provider

38

requiring prior notice of covered services); Butler Decl. ¶ 5 (same). Workers may raise objections only to the direct provision of care. Lorenz Decl. ¶ 11, Ex. A. Under the Rule, the burden will shift to providers to ask essentially every employee (rather than just medical staff) about any objections that the employee might have to any job duties, even those duties only remotely connected to patient care. *See* 84 Fed. Reg. at 23,186-23,187 (stating that "[s]cheduling an abortion" or "preparing a room and the instruments for an abortion" constitute "assistance"). If the Rule goes into effect, the County will be forced to bear the costs of asking thousands of employees those questions and processing the responses. *See* Lorenz Decl. ¶ 12. Those administrative costs also are an irreparable harm. *See California*, 911 F.3d at 581.

The requirement that the County change its policies to comply with the Rule also conflicts with the County's power as a local government to craft policies and procedures that are tailored to community needs. In threatening to cut off hundreds of millions of dollars in federal funding, HHS will be unlawfully coercing the County to force it to adopt federal policy, contravening the Spending Clause and overstepping the Executive Branch's constitutional role. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012). That coercion will cause irreparable harm to the County. *See Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 538 (N.D. Cal. 2017) ("By forcing the Counties to make this unreasonable choice [between complying with an unconstitutional Executive Order and losing millions of dollars in federal grants], the Order results in a constitutional injury sufficient to establish . . . irreparable harm.").

### C. The Rule Will Compromise Plaintiffs' Operations, Missions, And Core Functions

The Rule will jeopardize Plaintiffs' ability to ensure high quality, compassionate, and culturally competent care and to comply with their legal obligations and medical ethics requirements. Even if Plaintiff providers are able to survey all their employees promptly about religion-based objections, they likely still will not be able to ensure proper patient care. The Rule bars reassignment of employees without their consent, potentially even when an employee cannot fulfill his job duties because of his religious objections. *See* 84 Fed. Reg. 23,191-23,192 (stating that religious objections must not disqualify a person from a job position and leaving unanswered

1    what happens if the objected-to activities are core job duties). Thus, Plaintiffs may be unable to

2    address religious objections through accommodations and reassignments. *See* Nguyen Decl. ¶ 5.

3    This will interfere with providers' ability to ensure proper care and will harm patients across the

4    country.

5        For example, a pharmacist in the County's health system who is the only pharmacist on site

6    may refuse to dispense contraception, *see* Singh Decl. ¶¶ 9-10; a receptionist may refuse to schedule

7    a transgender patient for an appointment to discuss gender-affirming care, *see* Nguyen Decl. ¶ 6;

8    or a healthcare professional may refuse to inform a pregnant person that their pregnancy is non-

9    viable, McNicholas Decl. ¶ 23; Phelps Decl. ¶ 25. An employee could object even to passing along

10   the patient's information and requests to a coworker. As a result, the patient may not receive the

11   care they seek. *See* Nguyen Decl. ¶¶ 6, 9; Butler Decl. ¶ 8. The Rule will compromise providers'

12   ability to deliver care, and so it will cause irreparable harm. *California*, 2019 WL 1877392, at *8.

13       The Rule will frustrate all Plaintiffs' core missions of providing high-quality,

14   nondiscriminatory healthcare. Barnes Decl. ¶¶ 11, 22-25; Burkhart Decl. ¶ 30. That alone is

15   irreparable harm. *See California*, 2019 WL 1877392, at *8 (HHS regulation restricting Title X

16   grants imposed likely harm on organizational plaintiffs' "mission to promote access to high-quality

17   healthcare"). Patients subject to these religious objections will, justifiably, lose trust in healthcare

18   providers, compromising the patient-provider relationship and undermining the providers'

19   missions. Lorenz Decl. ¶ 15; Cody Decl. ¶ 8. For example, communities rely on Trust Women

20   Seattle and Hartford Gyn as safe places for them to receive nonjudgmental care and information.

21   Were these clinics to lose their ability to protect patients from delayed and denied care, stigma, and

22   judgment, they would sacrifice their central missions. Barnes Decl. ¶¶ 20-23; Burkhart Decl. ¶¶ 26,

23   30.

24       Providers and patients will suffer significant harm because, although providers previously

25   have been able to expect all staff to assist patients in the event of an emergency, the Rule includes

26   no emergency exception and in fact contemplates that religious objectors can deny care in an

27   emergency. *See* 84 Fed. Reg. at 23,176. The Rule consciously declines to address what providers

28   can require of their employees in an emergency. *See id.* at 23,176. This will threaten patient safety

and cause irreparable harm from the moment the Rule goes into effect. *See City & Cnty. of S.F.,* 897 F.3d at 1244 (need for certainty about how to maintain federal funding justified a permanent injunction). This lack of clarity is especially problematic given providers' obligation to comply with EMTALA. In the face of this uncertainty, the only way that providers could both ensure patient safety and protect their federal funding would be to double staff in preparation for objections during emergencies—a prohibitively expensive practice. Nguyen Decl. ¶ 6; Lorenz Decl. ¶ 19; Burkhart Decl. ¶ 30.

Moreover, without certainty on how to comply and keep their federal funding, the healthcare provider Plaintiffs' ability to budget, plan for the future, and properly serve their patients would be irreparably harmed. *See Cnty. of Santa Clara*, 250 F. Supp. 3d at 537. And providers like the County would face immediate exposure to punitive penalties for any asserted violation of the Rule. If despite the County's best efforts, an OCR official believes that the County has failed to comply, the County could lose all federal funding—which would devastate its ability to continue providing care to patients. *See* Lorenz Decl. ¶ 24; Cody Decl. ¶ 19 ("Many, if not most, of the individuals served through the Public Health Department's various programs simply would not get the care and resources that they need without federally funded services.").

It is already the case that religion-based objections to care by institutions and individuals are pushing abortion and contraception care and training out of healthcare facilities across the country. Phelps Decl. ¶ 35. Under the Rule, there will likely be even more hospitals and facilities that will be forced to forgo providing abortion, contraception, or LGBT services entirely. McNicholas Decl. ¶ 27; Phelps Decl. ¶ 29; Shafi Decl. ¶ 15. That discontinuation of services by some providers would impose additional financial burdens on providers that continue to provide full reproductive and LGBT healthcare services, as patients would look to them to serve the needs previously met elsewhere. *See* Vargas Decl. ¶ 17; Shanker Decl. ¶ 9; Shafi Decl. ¶¶ 20-22; Cummings Decl. ¶¶ 15-16. For example, Medical Students for Choice ("MSFC") already struggles to meet the need for family planning training, and it anticipates that under the Rule, it will not have capacity to instruct the growing number of medical students and residents who want and need education in contraception and abortion. Phelps Decl. ¶ 49. If healthcare entities decide to stop

providing abortion and contraceptive care and associated training to avoid conflict with the Rule, it will devastate access to that care throughout the country. Backus Decl. ¶ 18; Phelps Decl. ¶¶ 30, 35.

Some Plaintiffs will need to redirect their resources to helping patients deal with the Rule's effects, frustrating their missions and causing them irreparable harm. *Cf. Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). For example, Center on Halsted has already redirected resources to providing information to its clients about the Rule and to holding internal trainings on it. Valle Decl. ¶ 16. And GLMA has also had to divert resources to educate and assist its members and their patients in understanding the Rule and coming up with ways to ameliorate its adverse effects. Vargas Decl. ¶ 15.

### III.   THE BALANCE OF THE EQUITIES FAVORS PLAINTIFFS, AND AN INJUNCTION IS IN THE PUBLIC INTEREST

The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," while paying "particular regard for the public consequences" of entering or withholding injunctive relief. *Winter*, 555 U.S. at 20, 24. When the government is the defendant, those inquiries merge, resulting in a balancing that turns on the public interest. *Nken v. Holder*, 556 U.S. 418, 435-36 (2009).

It is in the public interest to permit Plaintiffs' hospitals and other healthcare facilities to continue operating and serving patients. Many of them are facilities of last resort for patients. Manley Decl. ¶ 7; Shafi Decl. ¶¶ 18-20; Cummings Decl. ¶¶ 9-13; Valle Decl. ¶¶ 5-7, 14. The prevention of widespread public-health harms vastly outweighs any interest that HHS can claim in immediate enforcement of the Rule. *See California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018) (in an APA challenge to HHS rules about contraceptive coverage, the balance of equities favored a preliminary injunction because the rules risked "potentially dire public health and fiscal consequences" in contravention of the "public interest in access to contraceptive care"). An injunction also would prevent an upheaval in medical practice, which the medical community has vigorously opposed. *See* AMA Cmt. Ltr. 7.

1    Plaintiffs also have demonstrated that the likely result of the Rule's enforcement against

2   them is a violation of their patients' constitutional rights, which must outweigh any interest that

3   HHS has in immediate changes to Plaintiffs' practices. *See Melendres*, 695 F.3d at 1002 (final

4   factors of preliminary-injunction standard always weigh in favor of "prevent[ing] the violation of

5   a party's constitutional rights"); *Planned Parenthood Ass'n of Cincinnati, Inc. v. Cincinnati*, 822

6   F.2d 1390, 1400 (6th Cir. 1987) (similar). This harm outweighs any government interest in

7   immediate enforcement of the Rule.

8    Because there will be many immediate harms to providers, patients, and the public health if

9   the Rule is enforced, and no harms to the government if the Rule is delayed, the public interest

10   clearly favors freezing the status quo pending final resolution of Plaintiffs' claims.

11   **IV.    THE COURT SHOULD ENTER A NATIONWIDE INJUNCTION**

12    The Court's authority to issue a nationwide injunction is well-established. *See, e.g.*, *Texas*

13   *v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) ("It is not beyond the power of a court, in

14   appropriate circumstances, to issue a nationwide injunction."). "[T]he scope of injunctive relief is

15   dictated by the extent of the violation established, not by the geographical extent of the plaintiff." *E.*

16   *Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1255 (9th Cir. 2018) (quoting *Califano v.*

17   *Yamasaki*, 442 U.S. 682, 702 (1979)). There is "no general requirement that an injunction affect

18   only the parties in the suit." *Regents of the Univ. of Cal.*, 908 F.3d at 511 (quoting *Bresgal v. Brock*,

19   843 F.2d 1163, 1169 (9th Cir. 1987)). Instead, "[a]n injunction may extend 'benefit or protection'

20   to nonparties if such breadth is necessary to give prevailing parties the relief to which they are

21   entitled." *E. Bay*, 909 F.3d at 1255 (internal quotation marks omitted); *accord Azar*, 911 F.3d at

22   582.

23    Nationwide relief is necessary to forestall the significant harms threatened here. Plaintiffs

24   are located throughout the United States and include three nationwide associations of medical

25   professionals (MSFC, AGLP, and GLMA) whose members work in hundreds, if not thousands, of

26   healthcare facilities across the country. *See* Vargas Decl. ¶ 2; Phelps Decl. ¶ 3; Harker Decl. ¶ 2. A

27   nationwide injunction therefore is required simply to give complete relief to the Plaintiffs in this

28   case. The Rule will frustrate MSFC's mission by incentivizing "the limited number of remaining

programs training students and residents in abortion and contraception to discontinue family planning training." Backus Decl. ¶ 11. The Rule will undermine GLMA's mission of ensuring nondiscriminatory care for LGBT patients across the country, Vargas Decl. ¶¶ 1-2, not only by encouraging providers to raise more religious objections but by intimidating professional accreditation bodies "from holding healthcare providers accountable for discrimination against LGBTQ people." *Id.* ¶ 10. The Rule will frustrate AGLP's mission of promoting LGBTQ mental health and supporting personal growth for LGBTQ psychiatrists by undermining "safe work spaces for LGBTQ psychiatrists and nondiscriminatory healthcare services to [their] LGBTQ patients." Harker Decl. ¶¶ 1, 6, 9, 10. These harms can be avoided only if the Rule is enjoined as to everyone.

Plaintiff healthcare providers also will be deprived of complete relief if the injunction is limited to the parties in this case. An injunction limited to the parties here will not "prevent the . . . harm . . . detailed in the record." *Azar*, 911 F.3d at 584. If Plaintiffs do not have to comply with the Rule, but all other healthcare providers do, Plaintiffs will become the only option for avoiding the risk of discrimination. That will impose immense burdens on Plaintiffs' operations. The Rule would hamper not only Plaintiffs' "ability to provide services to their *current* clients," but also "their ability to pursue their programs writ large." *E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1121 (N.D. Cal. 2018).

Finally, Plaintiffs have established that the Rule violates the APA—a paradigmatic circumstance for enjoining a regulation nationwide. *Regents*, 908 F.3d at 511-12 (nationwide injunctive "relief is commonplace in APA cases"). "In this context, '[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated— not that their application to the individual petitioners is proscribed." *Id.* at 511 (quoting *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)). The Rule's harms will be immediate and severe, and they will occur nationwide. But this Court can avoid them simply by putting the Rule on pause.

## CONCLUSION

The Court should preliminarily enjoin implementation of the Rule.

1    DATED: June 11, 2019                          Respectfully Submitted,

2    By: */s/ Richard B. Katskee*                  By: */s/ Mary E. Hanna-Weir*

3    RICHARD B. KATSKEE*                           JAMES R. WILLIAMS, County Counsel
     *katskee@au.org*                              (SBN 271253)
4    KENNETH D. UPTON, JR.**                       GRETA S. HANSEN (SBN 251471)
     *upton@au.org*                                LAURA S. TRICE (SBN 284837)
5    AMERICANS UNITED FOR SEPARATION               MARY E. HANNA-WEIR (SBN 320011)
     OF CHURCH AND STATE                           SUSAN P. GREENBERG (SBN 318055)
6    1310 L Street NW, Suite 200                   H. LUKE EDWARDS (SBN 313756)
                                                   *mary.hanna-weir@cco.sccgov.org*
7    Washington, DC 20005                          OFFICE OF THE COUNTY COUNSEL,
     Tel: (202) 466-3234                           COUNTY OF SANTA CLARA
8                                                  70 West Hedding Street, East Wing, 9th Floor
     *Counsel for Plaintiffs Other Than County of* San José, California 95110-1770
9    *Santa Clara*                                 Tel: (408) 299-5900

10
                                                   *Counsel for Santa Clara County*
11

12   By: */s/ Genevieve Scott*                     By: */s/ Lee H. Rubin*
     GENEVIEVE SCOTT*                              LEE H. RUBIN (SBN 141331)
13   *gscott@reprorights.org*                      *lrubin@mayerbrown.com*
     RABIA MUQADDAM*                               MAYER BROWN LLP
14   *rmuqaddam@reprorights.org*                   Two Palo Alto Square, Suite 300
     CHRISTINE PARKER*                             3000 El Camino Real
15   *cparker@reprorights.org*                     Palo Alto, California 94306-2112
     CENTER FOR REPRODUCTIVE RIGHTS                Tel: (650) 331-2000
16   199 Water Street, 22nd Floor
17   New York, NY 10038                            MIRIAM R. NEMETZ*
     Tel: (917) 637-3605                           *mnemetz@mayerbrown.com*
18                                                 NICOLE A. SAHARSKY*
     *Counsel for Plaintiffs Other Than County of* *nsaharsky@mayerbrown.com*
19   *Santa Clara*                                 MAYER BROWN LLP
                                                   1999 K Street, Northwest
20   By: */s/ Jamie A. Gliksberg*                  Washington, DC 2006-1101
     JAMIE A. GLIKSBERG*                           Tel: (202) 263-3000
21   *jgliksberg@lambdalegal.org*
     CAMILLA B. TAYLOR*                            *Counsel for All Plaintiffs*
22   *ctaylor@lambdalegal.org*
23   LAMBDA LEGAL DEFENSE AND
     EDUCATION FUND, INC.                          * Admitted pro hac vice
24   105 West Adams, 26th Floor                    ** *Licensed in Oklahoma and Texas only.*
     Chicago, IL 60603-6208                        *Supervised by Richard B. Katskee, a member of*
25   Tel: (312) 663-4413                           *the D.C. Bar. Admitted pro hac vice*

26

27

28

1

2

OMAR GONZALEZ-PAGAN*
*ogonzalez-pagan@lambdalegal.org*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005-3919
Tel: (212) 809-8585

3

4

5

6

*Counsel for Plaintiffs Other Than County of
Santa Clara*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of June, 2019, I electronically transmitted the attached

document to the Clerk's Office using the CM/ECF system for filing.

By: */s/ Lee H. Rubin* _____

47